**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH A. BARKER, REGIONAL DIRECTOR** | ) | |
| **OF REGION 13 OF THE NATIONAL LABOR** | ) | |
| **RELATIONS BOARD, FOR AND ON BEHALF** | ) | |
| **OF THE NATIONAL LABOR RELATIONS** | ) | |
| **BOARD** | ) | **Civil No. 11-CV-2255** |
| | ) | |
| **Petitioner** | ) | |
| **v.** | ) | **Judge Dow** |
| | ) | **Magistrate Judge Soat** |
| **A.D. CONNER, INC. AND HEIDENREICH** | ) | **Brown** |
| **TRUCKING COMPANY AS ALTER EGOS** | ) | |
| **Respondent.** | ) | |


**RESPONDENTS' BRIEF IN RESPONSE TO PETITIONER'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE PETITION FOR INJUNCTIVE RELIEF UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT**

## TABLE OF CONTENTS

I. Statement of the Case…………………………………………………………p. 5

II. Statement of Facts………………………………………….....………………...p. 7

III. Legal Standard……………………………………………………………..p. 11

IV. Argument……………………………………………………………………..p. 12

    **A.** There is no likelihood of success on the merits…………………………p. 12

        **(i)** Respondents did not violate 29 U.S.C. § 158(a)(1)………..p. 12

        **(ii)** Heidenreich is not Conner's alter ego……………………...p. 15

        **(iii)** Respondents did not violate 29 U.S.C. § 158(a)(3)………..p. 18

        **(iv)** Respondents did not violate 29 U.S.C. § 158(a)(5)………..p. 21

    **B.** Irreparable Harm will not Occur Absent the Imposition of the Injunction……………………………………………….………p.21

    **C.** An Adequate Remedy Exists…………………………….…………..p. 25

    **D.** Public Interest does not Necessitate the § 10(j) Injunction……………….p. 25

V. Discovery and an Evidentiary Hearing are Warranted…………………….……p. 26

    **A.** The Regional Director's Testimony is Relevant and Necessary…………..p. 27

    **B.** A Precedence Exists to Allow Discovery……………………………..…..p. 27

    **C.** The Credibility of Petitioner's Reasoning for a § 10(j) Petition may Only be Assessed Through Discovery and an Evidentiary Hearing ……..….p. 28

VI. Conclusion……………………………………………………………..… p. 29

## TABLE OF AUTHORITIES

*Amalgamated Meat Cutters, et al. v. NLRB*, 663 F.2d 223 (9th Cir. 1980)………………….......5-6

*American Ship Building Co. v. NLRB*, 380 U.S. 300 (1965)……………………………….. 12, 18

*Barker v. Indus. Hard Chrome LTD.*, 2007 U.S. Dist. LEXIS 3565
N.D. Ill. Jan. 18, 2007)……………………………………………………………………... 11-12, 24

*Bloedorn v. Francisco Foods*, 276 F.3d 270 (7th Cir. 2001)…………………………………......11

*Crawford Door Sales Co.*, 226 NLRB 1144 (1976)…………………………………………….…16

*Howard Johnson Co. v. Hotel & Restaurant Employees*, 417 U.S. 249 (1974)………..................16

*Int'l Union of Operating Engineers v. Centor Contractors,* 831 F.2d 1309
(7th Cir. 1987)……………………………………………………………………………………….15

*Kinney v. Pioneer Press*, 881 F.2d 485 (7th Cir. 1989)…………………………………….…..23

*Lineback v. Spurlino Materials, LLC*, 546 F.3d 491 (7th Cir. 2008)…………………..12, 24-5, 26
n.6, 28

*Madden v. Milk Wagon Union Local 753, et al.*, 229 F.Supp. 490 (N.D. Ill. 1964)……….........28

*Medeco Security Locks, Inc. v. Swiderek*, 680 F.2d 37 (7th Cir. 1981)…………………............29

*Nestle Holdings, Inc. v. Cent. States, Southeast and Southwest Areas Pension Fund,*
342 F.3d 801 (7th Cir. Ill. 2003)……………………..………………………………………………25 n.5

*Nken v. Holder*, 129 U.S. 1749 (2009)…………………….…………………………....………..12

*NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395 (1952)…………….……………....………….21

*NLRB v. Electro-Voice*, 83 F.3d 1559, 1573 (7th Cir. 1996)…………………………......24, 26, 28

*NLRB v. Illinois-American Water Co.,* 933 F.2d 1368 (7th Cir. 1991)……….……......…..........15

*NLRB v. International Brotherhood of Teams, et. al*, 938 F.2d 815 (7th Cir. 1991)….……..........13

*NLRB v. Joy Recovery Technology Corp.,* 134 F.3d 1307 (7th Cir. 1998)…..….……13, 18, 20, 21

*NLRB v. Modern Drop Forge Co.*, 1997 U.S. App. LEXIS 5185…………………….…..….…..27

*NLRB, et al. v. Overnite Transporation Company*, 380 U.S. 300 (7th Cir. 1991)…..………......21-3

*NLRB v. Q-1 Motor Express,* 25 F.3d 473 (7th Cir. 1994)……………………….....…..….…..13

*Trustees of the Pension, et al. v. Favia Electric Company, Inc.*, 995 F.2d 785
(7th Cir. 1993)……………………………………………………………………...…………..15

*Union of Operating Engineers v. Centron Contractors,* 831 F.2d 1309, 1312
(7th Cir. 1987) ....................................................................................................................15

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)…………...……..……24

*Yesterday's Children, Inc. v. NLRB*, 115 F.3d 36, 22 (1st Cir. 1997)…………...……........12,17

## Statutes Involved

29 U.S.C. §160(j)...............................................................................................5-6, 11, 26-9

29 U.S.C. §158(a)(1)...............................................................................................6,12

29 U.S.C. §158(a)(3)...............................................................................................6,18

29 U.S.C. §158(a)(5)...............................................................................................6, 21

29 U.S.C. § 158(c)...............................................................................................14

535603v1

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH A. BARKER, REGIONAL DIRECTOR | ) | |
| OF REGION 13 OF THE NATIONAL LABOR | ) | |
| RELATIONS BOARD, FOR AND ON BEHALF | ) | |
| OF THE NATIONAL LABOR RELATIONS | ) | |
| BOARD | ) | **Civil No. 11-CV-2255** |
| | ) | |
| Petitioner | ) | |
| v. | ) | **Judge Dow** |
| | ) | **Magistrate Judge Soat** |
| A.D. CONNER, INC. AND HEIDENREICH | ) | **Brown** |
| TRUCKING COMPANY AS ALTER EGOS | ) | |
| Respondent. | ) | |

**RESPONDENTS' BRIEF IN RESPONSE TO PETITIONER'S MEMORANDUM OF**
**POINTS AND AUTHORITIES IN SUPPORT OF THE PETITION FOR INJUNCTIVE**
**RELIEF UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT**

Respondents, Conner, Inc. and Heidenreich Trucking Company as alter ego

("Respondents" or "Conner" or "Heidenreich"), by and through its attorneys, Pedersen & Houpt,

within the time set forth by the order of this Court, hereby submits its Brief in Response to

Petitioner's Memorandum of Points and Authorities in Support of the Petition for Injunctive Relief

Under Section 10(j) of the National Labor Relations Act ("NLRA"), as follows:

**I.  STATEMENT OF THE CASE**

This §10 (j) Petition was brought on April 4, 2011, three weeks after the National Labor

Relation Board ("NLRB") hearing and six months after the initiation of the investigations into

whether Respondents have engaged in unfair labor practices in violation of the NLRA. This § 10(j)

Petition is only the most recent in Petitioner's systematic and continuous harassment of

Respondents in its attempt to either force Respondents to comply with their misguided quest for

relief or else to drive the remaining entities out of business.[1] Despite the fact that at the time of the Board hearing, Petitioners had six months of discovery and investigation, they routinely and continually amended their complaint. The complaint, as it appeared before the Board, was the fourth such revision, with the last revision actually made verbally at the hearing during its first morning session.

Petitioner's § 10(j) Petition is for the most part, a regurgitated version of the Post-Hearing Brief it filed with the Administrative Law Judge ("ALJ") to review. The only difference is that Petitioner did not have the temerity to reiterate all of the charges it brought before the Board.[2] In its current form, the complaint before the ALJ charges that Respondents engaged in unfair labor practices by violating § 8(a)(1), § 8(a)(3), and § 8(a)(5) of the NLRA and that all of the entities either operate as a single employer, or Heidenreich is A.D. Conner's alter ego, as A.D. Conner continues to operate as a disguised continuance of Heidenreich, or Heidenreich is A.D. Conner's successor such that the surviving entities would be compelled to be subjected to a collective bargaining agreement with Teamsters Locals 705 and 142.

---

[1] Apart from this § 10(j) petition, there are currently three separate lawsuits filed in two different federal courts and two potential lawsuits stemming from the one incident in question. The lawsuits in question include: (1) *Local 705 International Brotherhood of Teamsters Pension Fund et al v. A.D Conner, Inc.*, 2010-CV-6352 (Guzman, J.); (2) *Teamsters Local Union 705 v. A.D. Conner, Inc.,* 2010-CV-6916 (Kennelly, J.); (3) *Teamsters Union Pension Trust Fund Trustees of the v. A.D. Conner, Inc.*, 2010-CV-00368 (Simon, J), U.S. District Court for the Northern District of Indiana; and (4) *In the Matter of A.D. Conner, Inc., Gas City, Ltd., Heidenreich Trucking Company, McEnery Enterprises, McEnery Trucking & Leasing, LLC, and WJM Leasing, as Single Employers and/or A.D. Conner, Inc. and Heidenreich Trucking Compnay as Alter Egos, and the International Brotherhood of Teamsters Local No. 142, et al. and the International Brotherhood of Teamsters Local No. 705, et al.*, 13-CA-46460, before the National Labor Relations Board. The Motion to Quash and § 10(j) proceeding: *Joseph A. Barker, Regional Director of Region 13 of the National Labor Relations Board, for and on Behalf of the National Labor Relations Board v. A.D. Conner, Inc. and Heidenreich Trucking Company as Alter Egos*, 2011-CV-2255, (Dow, R.). The pending lawsuit is on behalf of the Michigan Conference of Teamsters Welfare Fund and will be filed in the United States District Court for the Eastern District of Michigan. The other is a threatened withdrawal liability action which would be brought here.

[2] Petitioner charged that, in addition to Heidenreich being Conner's alter ego, Respondents were also operating as a single employer and were successors-in-interest. These charges are not duplicative, as Petitioner claims, as in truth, Petitioner brought these charges in the alternative. This is simply additional support that Petitioner is not likely to succeed on the merits of the case before the Board, because Petitioner is making numerous baseless allegations in the hope that one of these charges will stick.

## II.  STATEMENT OF FACTS

In 1982, William J. McEnery ("McEnery") incorporated A. D. Conner, Inc. ("Conner") for the purpose of hauling petroleum to gas stations locally. Transcript of the Labor Board Hearing, hereinafter referred to as "Tr." 669. In 1993, McEnery started The William J. McEnery Revocable Trust, to which he is the sole a trustee. Said trust purchased and is the sole owner of Conner, WJM Leasing, LLC, McEnery Trucking and Leasing, LLC, Gas City Ltd., and McEnery Enterprises, LLC, respectively, while McEnery is the president and secretary of the listed entities. Tr. 584-586. Conner had two locations, Frankfort, Illinois and Porter, Indiana. Out of these entities, only Conner ever belonged to a union. The employees at the Frankfort location belonged to Teamsters Local Number 705 ("Local 705"), while the employees at the Porter location belonged to Teamsters Local Number 142 ("Local 142"). In 2010, the Frankfort location consisted of 56 drivers, and the Porter location had 21 drivers. General Counsel, hereafter G.C. Exh. 51, attached hereto. The two locations shared the some dispatchers. Tr. 838. Other than McEnery, who by 2010 had essentially removed himself from the day-to-day operations of any of the separate entities, only David Christopher had a managerial role at Conner. Christopher served as the Vice President of Operations at Conner. Of the dispatchers, Ted Lowery was considered Christopher's contact person to speak on behalf of the dispatchers to avoid confusion that might otherwise occur if multiple dispatchers shared information. Lowery was not a supervisor as Lowery was on the same operational level as the rest of the dispatchers and was never a supervisory or managerial role at Heidenreich or Conner. Tr. 854.

In 1986, Bob Heidenreich separately incorporated Heidenreich Trucking Company ("Heidenreich") for the purpose of hauling ethanol to refineries. This business consisted solely of owner-operator drivers. That is, the drivers owned their own trucks and were independent contractors of the company. Heidenreich's drivers did not belong to a union and never expressed a

7

desire to unionize. The rates Heidenreich charged its customers were pre-determined and set at arm's length. In 2004, Bob Heidenreich sold his business to The William J. McEnery Revocable Trust, but he remained in a supervisory position, sharing the responsibilities with Peter Casper. Tr. 667. Casper and Bob Heidenreich were in charge of the labor relations for Heidenreich. Heidenreich continued to run as it had previously done, with its same customer base and business purpose, except for its move into the Frankfort office which it shared with Conner. Heidenreich continued to charge the same customer rates. While Heidenreich was operating simultaneously with Conner, the unions had no issue with it.

Though the entities share common ownership, they maintained separate identities, including separate Federal Employer Identification Numbers, separate telephone numbers, separate facsimile numbers, separate banking relationships, separate management, separate business purposes, separate operations, and separate equipment. McEnery ensured that corporate formalities were always honored. For instance, though Gas City was Conner's customer, Conner set the rates it charged Gas City at arm's length, through the use of a rate book that used market prices.

By 2010, two of the entities began to collapse. In June, 2010, Gas City filed for bankruptcy and began procedures to restructure. Gas City lost its line of credit with Bank of America and was forced to shift to a "cash-basis," meaning that it could only pay its carriers in cash. At the same time, Conner began to lose its customers. Previously, Conner serviced gas stations at Jewel, Marathon, Speedway, Shell, and BP Amoco. Tr. 688. One by one, Conner lost these customers, until the only large account remaining was Gas City. Gas City's inability to pay with anything other than cash crippled Conner even further, forcing them to reevaluate their business structure. By 2010, Conner was earning less than it was spending, and as a last resort, decided to cut the wages of its employees. In recognition of the fact that any wage concessions would have to be

8

approved by the unions, and in an attempt to salvage the once promising company, McEnery wrote a letter to Local 705 in February, 2010. Tr. 807. Christopher, who was responsible for negotiating with the unions, contacted Tony Serwas of Local 705. Serwas, in turn, was charged with negotiating on both the unions' behalf (though Christopher telephoned Lesley Lis of Local 142 to apprise him of the negotiations). Tr. 807. Christopher met with the representatives from Local 705 several times well into August, 2010. Tr. 809. However, no concessions were made and no new collective bargaining agreement was entered into between Conner and Locals 705 and 142. With the financial situation only growing more dire, McEnery and Christopher held meetings with the drivers, on September 21, 2010 in Frankfort and September 28, 2010 in Porter. These meetings informed the drivers of the bleak outlook, and Christopher handed out a pamphlet that showed the proposals Conner had for the unions to prevent surprises, since McEnery and Christopher did not know what was communicated to the employees by the unions since June, 2010. Tr. 824, 862.

On September 23, 2010, an email was finally sent by Neil Messino, the contract administrator from Local 705 who also had the authority to negotiate on behalf of the union, to unilaterally schedule a meeting with Christopher for October 18, 2010. On October 9, 2010, the members of the union, after months had lapsed, held a meeting with respect to the wage concessions. On October 13, 2010, Conner could no longer continue to operate, as it was not even able to meet the payroll for that week, and decided to cease all operations and conclusively shut the company down. Tr. 867. The unions were immediately notified that the last day of operations would be October 18, 2010. The collective bargaining agreement between Conner and Local 705 and 142 expired on October 31, 2010.

With Conner closing, Gas City now needed to find a petroleum hauler. However, its bankruptcy status discouraged all other carriers from agreeing to service them. As a result, in

October, 2010, Heidenreich had to enter the commercial petroleum hauling business and haul fuel to Gas City to prevent that entity from also closing its doors, with Gas City hiring Heidenreich for its services. Tr. 894-895.

Once Conner ceased operations, Christopher for the first time began to work for Heidenreich, assuming Bob Heidenreich's role, under the title of Vice President of Operations. Casper continued his role of overseeing the 61 owner-operator drivers who had previously been employed by Heidenreich and continued to be employed by Heidenreich. All Conner employees were given application forms to submit for employment at Heidenreich. Of the remaining drivers at Conner (excluding those drivers that had already left Conner after sensing the financial peril), only 16 drivers were hired as empoyees by Heidenreich. Out of the seven dispatchers at Conner, two dispatchers were hired at Heidenreich. Robert Lofrano, who had worked as a dispatcher at Conner for seven years and had worked at Conner for a total of twenty-four years, was one of the dispatchers not hired at Heidenreich, despite filling out an application for employment. Sixteen drivers and two dispatchers was not a majority of Conner's employees.

The Porter branch of Heidenreich operates from a different location than Conner's Porter location. When Conner was in business, the facility was run in a Steel City building with a Steel City manager. Tr. 248-251. Heidenreich's Porter branch is run out of a trailer. Tr. 251, 296-298.

Since the closing of Conner was unexpected, there was a disorganized incorporation of the former Conner employees into Heidenreich. For two weeks, the new Heidenreich drivers did not have permanent driving routes. Tr. 149. It was uncertain whether there would even be enough drivers to service Gas City. Tr. 691. There were no benefits and wage packages for the newly hired employees. Tr. 192; Tr. 291. The workers did not have insurance forms to fill out to qualify for medical insurance until well after they started. The Porter employees were not given anyone to

535603v1

10

report to and were only told their start date, with no one present to give them instructions. Tr. 294-295.

Generally, to qualify as a carrier for a gas station for a particular customer, there is a detailed vetting process that can take months to complete before final approval is given. For that reason, when Conner shut down suddenly, Heidenreich was not able to obtain haul for most of Conner's customers as it had not gone through the vetting process with them. Tr. 871. Heidenreich and Conner's customer bases did not overlap.

## III.  LEGAL STANDARD

Relief under § 10(j) "is an extraordinary remedy…reserved for 'those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process.'" *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008) (quoting *Bloedorn v. Francisco Foods*, 276 F.3d 270, 297 (7th Cir. 2001)). It is for that reason that the court will only grant injunctive relief pursuant to § 10(j) if the circumstances are such that it would be "just and proper" to do so under the "equitable principles that normally guide a court in granting injunctive relief." *Barker v. Indus. Hard Chrome LTD*., 2007 U.S. Dist. LEXIS 3565 *11-12, (N.D. Ill. Jan. 18, 2007), (quoting *Bloedorn*, 276 F.3d at 286). To establish that relief under § 10(j) is indeed warranted, the burden is on the Petitioner, who in turn, must prove the elements of a four-part test, including: "(1) no adequate remedy at law; (2) public harm will result absent the injunction; (3) the labor effort will be irreparably harmed, and that such harm outweighs irreparable harm to the employer;" and (4) a likelihood of success on the merits. *Id*. at 12. Petitioner is required to satisfy the first three prongs by a preponderance of the evidence. *Id*. The last factor requires a showing of "more than a mere possibility" of a likelihood of success. *Nken v. Holder*, 129 U.S. 1749, 1761 (2009).

## IV.  ARGUMENT

## A. THERE IS NO LIKELIHOOD OF SUCCESS ON THE MERITS.

In evaluating the likelihood of success, Petitioner cites to cases that use an outdated standard that has since been revised by the United States Supreme Court. Specifically, Petitioner maintains that merely a showing that success on the merits "be better than negligible." However, the standard is higher, with the United States Supreme Court holding that "more than a mere 'possibility of relief is required.'" *Nken* at 1749. Even under the more lenient theory that Petitioner offers, the circumstances of this case do not support a finding that it is more than negligible that Respondents engaged in unfair labor practices. The court is limited to examining the "probability that the Regional Direct will prevail in the underlying complaint." *Indus. Hard Chrome* at *15; see *Bloedorn*, 276 F. 3d at 287. That threshold has not been met, and the Regional Director will not prevail in the underlying case because they have not carried their burden of proving that Respondents engaged in unfair labor practices.

### (i) Respondents did not violate 29 U.S.C. § 158(a)(1).

To establish a § 8(a)(1) violation, "it must be shown that the employer has interfered with, restrained, or coerced employees in the exercise of some right protected by § 7 of the [National Labor and Relations] Act." *American Ship Building Co. v. NLRB*, 380 U.S. 300, 308 (1965). Accordingly, it follows that if there is no such § 7 violation, there may not be a § 8(a)(1) violation. *Yesterday's Children, Inc. v. NLRB*, 115 F.3d 36, 22 (1st Cir. 1997). To fall within the purview of § 7, the union or its members' "conduct must be both concerted and protected." Id. § 7 grants the employees "the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining…" 29 U.S.C. § 157.

In determining whether such a § 8(a)(1) violation has indeed occurred, "the test for determining whether a violation has occurred is whether an employer's actions had a reasonable tendency to interfere with or coerce employees, not whether the employer intended to interfere." *NLRB v. Joy Recovery Technology Corp.,* 134 F.3d 1307, 1312 (7th Cir. 1998), (quoting *NLRB v. Q-1 Motor Express,* 25 F.3d 473 (7th Cir. 1994)). § 8(c) of the Act holds that "the expressing of any views, argument, or opinion thereof,….shall not constitute or be evidence of an unfair labor practice. 29 U.S.C. § 158(c). Though this is a limited privilege, as "the Act accords no protection for views, arguments, or opinions that contain a 'threat of reprisal or force or promise of benefit." *NLRB v. International Brotherhood of Teams, et. al,* 938 F.2d 815, 819 (7th Cir. 1991), (quoting *NLRB v. Illinois-American Water Co.,* 933 F.2d 1368, 1374 (7th Cir. 1991)).

In the matter at hand, Conner never threatened its employees, nor did it ever instruct its employees to decertify their unions. Petitioner makes vociferous accusations that are not supported by either the facts as they occurred or the record as it appears before this Court. At the Board hearing, Petitioner attempted to solicit the testimony that it now is claiming is the concrete proof that the employees were threatened, but the testimony fails to support that. See Tr. 45. To that end, Knorr and Pippen testified that on September 21, 2010, McEnery and Christopher gathered the members of Local 705 and lamented that Conner was in financial ruin, blaming the demise of the company on the union. Tr. 84, Tr. 167. Allegedly, McEnery followed this up with the assertion that Conner would no longer participate in the union. *Id.* Every single driver was required to be present at that meeting; however, the Petitioner was only able to convince Knorr and Pippen to testify.[3] With this discredited proof, Petitioner is now classifying this as uncorroborated testimony.

---

[3] Out of Conner's two locations, the Frankfort, IL location employed 56 drivers, and Porter, IN employed 21. In the Frankfort group, Bethune, Bruns, Coakes, Foster, Gamino, Jankowski, and Mleczko, were office workers as shown by their hourly wage rate or testimony, Bradtke, Downing, Lowrey, and Shipp were Dispatchers, Valentine was a trainer and Safety Director, and Daniel McEnery, Thomas McEnery and Dave Christopher were also not bargaining

Moreover, even if McEnery expressed his frustration, as has been stated, an employer is protected by § 8(c) for saying anything he wants, even spewing epithets directed at the union, as long as there are no threats accompanied with the criticism. And there were no threats. Petitioner paints the picture that McEnery and Christopher said to the drivers they are required to decertify, or else they will lose their jobs, but that is simply not true, as not one witness testified such statements were made or implied.

In fact, McClelland testified that on September 23, 2010, Christopher told Local 142 "that the company was losing money and that we need to take a pay cut and … cut in our pension," or else the company may have to close. Tr. 223. When asked why the company would have to close, Christopher responded it was because the company was losing money. *Id*. There were no attached threats with this statement. As further proof that Petitioner is merely molding the testimony so that it portrays what Petitioner would like to have happened, Petitioner claims that Christopher threatened McClelland when McClelland asked if it would help to decertify. Christopher never proposed it. McClelland never testified that Christopher implied it. Yet, Petitioner insists this rises to the level of threats so as to qualify it as unfair labor practice. Petitioner refers to Christopher's conversation with McClelland as following the same script. Neither Christopher nor McEnery could change the fact that Conner was in financial disrepair by September 21, 2010. It was not a script to follow; it simply was the truth.

---

unit employees. Tr. 657-58, 799-839. *See, also,* G.C. Exh. 51, which is attached hereto for the court's convenience, entitled Conner Employees From January 1, 2010 Through October 18, 2010. The parties stipulated at the Board Hearing that the individuals on G.C. Exh. 51, above the designation of "Department 4020" or Bates Pages No.s D-167-172, worked at Frankfort, and those above "Department 4030" or D-172-74, worked at Porter. *See* Stipulation of Counsel at Tr. 714-15. Yet, Petitioner *called only two* Frankfort drivers to testify, Knorr (Tr.53-146) and Pippin, (Tr.147-213), and only *three* Porter, IN drivers, McClelland (Tr.213-257). Meadows (Tr.257-302) and Flora (Tr. 433-60). This kind of missing supporting testimony was persuasive to Judge Kendall in denying the Regional Director's request for a 10(j) injunction in *Barker v. Indus. Hard Chrome L td.*, 2007 U.S. Dist. LEXIS 3565 *11-12, (N.D. Ill. Jan. 18, 2007), (quoting *Bloedorn*, 276 F.3d at 286).

Petitioner also claims that Respondents bypassed the unions to commence negotiations with the employees directly. However, once again, Petitioner misstates the record. Both McEnery and Christopher testified that negotiations for concessions had commenced in February, 2010. The unions did not respond to Christopher's pleas and calls when he desperately attempted to engage in good faith negotiations. When the meetings with the employees were finally held in September, 2010, it was intended to act as an informational session, and was not set in a threatening environment. McEnery and Christopher were unsure of whether the unions had been updating the employees since June, 2010, and used these meetings to inform the employees so they would not be surprised if there was a reduction in their wages, or if the worst case scenario came to be and Conner would have to close. There was no demand, as Petitioner claims, that Respondent's terms be accepted. Once again, Petitioner is obviously exaggerating the substance and strength of its case. Petitioner has to exaggerate, because the record does not support what it claims happened, and it is for that reason that Petitioner does not have a strong likelihood of success on these allegations.

### (ii) Heidenreich is not Conner's alter ego.

For the alter ego doctrine to apply, there must be "the existence of a disguise of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets….Unlawful motive or intent are critical inquiries in an alter ego analysis." *Trustees of the Pension, et al. v. Favia Electric Company, Inc.*, 995 F.2d 785, 789 (7th Cir. 1993), (quoting *Int'l Union of Operating Engineers v. Centor Contractors,* 831 F.2d 1309, 1312 (7th Cir. 1987)). According to the Supreme Court, "in an alter ego situation, 'there is a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management.'" *Amalgamated Meat Cutters, et al. v. NLRB*, 663 F.2d 223, 226 (9th Cir. 1980), (quoting *Howard Johnson Co. v.*

*Hotel & Restaurant Employees*, 417 U.S. 249, 259 n.5 (1974)). To ascertain whether an alter ego situation exists, the NLRB has created a balancing test. The test examines whether the two enterprises have "substantially identical management, business purpose, operation, equipment, customers and supervision, as well as ownership." *Id.* at 226-227, (quoting *Crawford Door Sales Co.*, 226 NLRB 1144 (1976)). Should an alter ego relationship be found, the succeeding company inherits the obligations imposed by the collective bargaining agreement between the preceding entity and its employees. *Id.* at 226.

In this case, it is true that The William J. McEnery Trust is the same owner, but that is the extent of the supposed "disguised continuance" of Conner in the form of Heidenreich. The management between the two entities are distinctly different. Christopher may be a similar manager for both Heidenreich and Conner, but at Heidenreich, Casper has the majority of the labor relations responsibility, since the majority of the drivers are owner-operators. Christopher is only tasked with overseeing the employee drivers.

Petitioner attempts to claim that Heidenreich and Conner engage in the same sort of business, but conveniently neglects contravening testimony. The truth is the business purposes of each of the entities vary significantly. While both entities may be in the business of hauling, the former hauls ethanol to refineries and the latter hauled petroleum to gas stations. Heidenreich's business spans nationally, whereas Conner focused its business locally. For that reason, the customers are entirely different. Heidenreich counts One Earth Energy, the Buckeye loading terminal, Badger State, Boyd Garrison, Carbon Solutions, Flatiron, Fuel Manager, Poet Ethanol, Good Oil, Mobile American, RKA Petroleum, Victory Bio, and Wholesale Oil as its customer as clients, while Conner serviced Jewel, Speedway, Shell, BP, Marathon, and other gas stations. The only common customer between Heidenreich and Conner is Gas City. Gas City, in the midst of

bankruptcy, had no choice but to use Heidenreich for its hauling needs so that it could continue to operate. The other customers have a complex vetting process that made it difficult for Heidenreich to simply inherit Conner's clients, as the Petitioner alleges. Those employees at Heidenreich, as opposed to owner-operators, may lease at least one truck owned by WJM Leasing, but the employees at Heidenreich are greatly out-numbered by owner-operators, who own their own trucks. Since the owner-operators do not need to lease trucks, there is little overlap between the equipment used by Conner and the equipment currently used by Heidenreich.

Petitioners paint a picture of a seamless transition between Conner to Heidenreich, when in reality, this could not be further from the truth. Since the closing of Conner was unexpected and necessitated by a total draining of funds, there was a disorganized incorporation of the few former Conner employees who were hired by Heidenreich. For two weeks, the new Heidenreich drivers did not have permanent driving routes. Tr. 149. It was uncertain whether there would even be enough drivers to service Gas City. Tr. 691. There were no benefits and wage packages for the newly hired employees. Tr. 192; Tr. 291. The workers did not have insurance forms to fill out to qualify for medical insurance until well after they started. The Porter employees were not given anyone to report to, and were only told their start date, with no one present to give them instructions. Tr. 294-295. Generally, to qualify as a carrier for a gas station for a particular customer, there is a detailed vetting process that can take months to complete before final approval is given. For that reason, when Conner shut down so suddenly, Heidenreich was not able to obtain approval from the past customers of Conner to begin hauling for them, even if Heidenreich wanted to venture into Conner's area of operations. Tr. 871.

Simply put, Petitioners are reaching when they accuse a legitimately non-unionized pre-existing national business and little overlapping business of somehow being a disguised

continuance of a defunct, struggling, local business. For that reason, it is unlikely the Petitioner

will succeed in quest to categorize Heidnreich as Conner's alter ego.

### (iii) Respondents did not violate 29 U.S.C. § 158(a)(3).

Under § 8(a)(3), employers are prohibited from engaging in activity that would

"discriminate in regard to hire or tenure of employment or any term or condition of employment to

encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An

employer violates this section "by retaliating against employees for engaging in union activities."

*Joy.,* 134 F.3d 1307, 1314 (7th Cir. 1998). "A finding of violation under this section will normally

turn on the employer's motivation." *American Ship Building* 380 U.S. 300 at 311 (1965).

According to the *Wright Line* test, the General Counsel must "prove that antiunion animus was

substantial or motivating factor in the employer's decision to make adverse employment

decisions." *Joy*, 134 F.3d at 1314. If the General Counsel is successful, the burden then shifts to

the employer to show that "it would have taken the action regardless;… for legitimate reasons." *Id.*

Unions and employers are encouraged to negotiate, but "there is nothing in the Act which gives

employees the right to insist on their contract demands, free from the sort of economic

disadvantage which frequently attends bargaining disputes." *American Ship Building*, 380 U.S. 300

at 311.

Respondents were not attempting to destroy or circumvent the unions, and the evidence

does not support the allegation that Respondents engaged in any sort of retaliatory behavior to

punish the Conner employees for refusing to decertify their unions. Rather, Conner was attempting

to salvage the company by negotiating with the unions get wage and fringe benefit concessions,

because they could not fiscally continue operations under the terms that were in place. Knorr

corroborated that Christopher had expressed the terms he was hoping the unions would agree to,

because it was what the "concessions would have to be for our company [Conner] to move

forward." Tr. 123. Messino testified that, as the contract administrator for Local 705, he discussed with Christopher about the "wage concessions" that were necessary to continue operations. Tr. 552. Indeed, Christopher confirmed that he was merely pleading for concessions with the unions, not to destroy its presence, but so the company could survive. During his testimony, he recalled that as he was meeting with the union representatives, he was making it clear that "we needed significant concessions in order to continue to operate." Tr. 809. At no point did Christopher ever veer from this message; the unions needed to cooperate and make concessions or else Conner would be forced to close. Christopher never said that he wanted to discourage membership in the unions and never discriminated against any of the Conner employees.

McEnery's supposed frustration with the unions at the September 21, 2010 meeting does not meet the burden to show discrimination or discouragement of union members. Isolated, the incident seems damaging; however, taken as a whole, it becomes clear that McEnery was simply at the end of his rope, faced with losing a company he had owned for almost three decades, and being met with silence whenever Conner attempted to negotiate with the unions.[4] McEnery may have exploded, but nothing came of his frustrations. In fact, he encouraged and promoted the unions, staying in business for as long as he fiscally could, while all the other businesses in the area had decertified. Christopher, as Vice President of Operations who was tasked with negotiating with the unions, resumed negotiations into September, 2010, while Conner was on its last legs. Conner attempted to negotiate with the unions in good faith. The fact that the unions were faced with economic disadvantages as they made their contract demands does not indicate that Conner was engaging in any sort of retaliatory behavior. There was no discrimination, as evidenced by the fact

---

[4] McEnery testified that Christopher repeatedly attempted to negotiate, but he was consistently met with silence. Tr. 592. Pippin testified Christopher was attempting to negotiate wages in June 2010, but nothing came of those discussions. Tr. 205-206. Christopher testified that he started asking the unions for concessions in February 2010. Tr. 826.

that Heidenreich hired 16 drivers from Conner, who had previously been unionized. The five drivers that testified stated they were unhappy that concessions would have to be made, and yet they were also hired by Heidenreich. If there was a vendetta against these union workers, it would stand to reason that Respondents would have avoided hiring these employees.

Assuming *arguendo* that Conner was motivated by a desire to discourage membership in the union, Conner would have closed operations separate from any animus it may have had toward the unions. The independent audit of Conner's financial records for 2010 showed that the company was losing money. Tr. 553. McEnery, as the owner of Conner and familiar with its financial disrepair, confirmed the company was "gushing" blood, as it continued to spiral out of control. Tr. 687. Unlike *Joy*, there is nothing suspect about the timing of the events. In *Joy*, the company closed its transportation department "on the heels of" the employees voting to certify a union. *Joy*, 134 F.3d 1307 at 1314. Conner had to close for legitimate business reasons. As McEnery testified, they no longer had the accounts they once had, like Jewel, Speedway, BP, Marathon, and Shell. Tr. 688. All of these accounts were lost to competitors, and once Gas City also filed for bankruptcy, Conner had no choice but to completely shut down operations.

Petitioner argues that Christopher "tipped off" these customers and caused Conner to shut down. However, this claim has no logical support. The Jewel, Speedway, Marathon, Shell, and BP Amoco accounts were already lost by October, 2010. Christopher was simply calling Conner's other remaining customers to inform them that Conner was legitimately closing. These customers found other carriers and did not use Heidenreich. If Heidenreich was simply a disguised continuance for Conner, the "tip off" would be that the customers should transfer to Heidnreich, but that did not happen. It is ludicrous to suggest that Conner drained itself of its customers,

sabotaged itself economically, and did not help Heidenreich to attain customers, all because they wanted to rid themselves of the unions. These facts, taken as a whole, reveal that § 8(a)(3) was not violated, and Petitioner will not likely succeed on this claim.

### (iv) Respondents did not violate 29 U.S.C. § 158(a)(5)

§ 8(a)(5) requires the employer to "bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The employer must approach the collective bargaining with "a good faith intention or a 'real desire' to come into agreement." *NLRB, et al. v. Overnite Transporation Company*, 380 U.S. 300, 821 (7th Cir. 1991). This is a mutual obligation, and the employee's representatives are also obligated to engage in negotiations. *Joy*, 134 F.3d 1307 at 1315. If there is good faith on one side, then the NLRB must end its inquiry, because the Act "does not compel either party to agree to a proposal or require the making of a concession…and it is inappropriate for the Board, either directly or indirectly, to 'compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." *Overnite*, 380 U.S. 300 at 821, (quoting *NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395 (1952)).

Respondents never refused to bargain, and in fact, persistently attempted to negotiate in good faith beginning in February, 2010. Unfortunately, Conner was met with resounding silence, and the unions only began to engage in negotiations in October, 2010. However, by that time, Conner's financial distress made it impossible for Conner to continue. McEnery first wrote to Local 705, initiating negotiations in February, 2010. Tr. 807. Christopher simultaneously contacted Sarwas and held a meeting with him. From then on, he consistently held meetings with Sarwas to negotiate concessions in an attempt to keep Conner afloat. Tr. 807. Pippin confirmed that, as far as he knew, Christopher was attempting to negotiate with the unions in June, 2010. Tr. 205. McClelland testified that Christopher tried to contact the unions, but that his calls were not being

returned. Tr. 224. Messino could only recall meetings with Christopher as far back as August,

2010, but this nevertheless proves that Conner was actively engaging in good faith bargaining. Tr.

549. In an effort to refute this notion, Lis denies that he was ever contacted by Christopher about

negotiations. Tr. 485. However, Local 142, Lis conceded that it was Messino who communicated

with Christopher on both Local 705 and 142's behalf. Tr. 504. In other words, Petitioners have

produced a witness to deny Christopher engaged in good faith bargaining with the unions, but then

subsequently admitted that Christopher appropriately did not communicate with that witness,

because Messino "was the one that had the communications with Mr. Christopher." Tr. 504.

Christopher confirmed as much, stating that his communication was restricted to Local 705, but

that he would later call Lis to inform him about the status of negotiations. Tr. 808.

      The court in *Overnite* determined that Respondent had engaged in unfair labor practice

under a totality of the circumstances test. In that case, Respondents openly declared their unlawful

intentions to refuse to bargain before the commencement of the bargaining process, and coupled

with Respondent's refusal to make any concessions at the bargaining table, led the court to

conclude that the "company was making good on a promise never to cooperate with the Union."

*Overnite*, 380 U.S. 300 at 822. Conner never declared they would never cooperate with the unions,

and instead, made every effort to begin the bargaining process early. Christopher consistently and

diligently attempted to negotiate the collective bargaining agreement with the unions, but he was

met with unreceptive bargaining partners. Conner never attempted to unilaterally negotiate with its

employees. The meeting held on September 21, 2010 was an informational meeting so the

employees could know of the bleak future of the company, and that the reality was, it may have to

close. Christopher and McEnery never said to the employees they either accept the employer's

terms or the company will close, but rather stated what the terms that were being negotiated with

the unions were, which were being ignored by the unions, so the employees would not be surprised should the bilateral negotiations fail.

It was only on September 23, 2010 that the unions, knowing how dire the situation was, began to go through the motions and sent an obligatory email to Christopher scheduling a meeting on October 18, 2010, mere days before the former collective bargaining agreement was set to expire on October 31, 2010, and much too late to salvage Conner. This was an attempt by the unions to imitate good faith bargaining. Tr. 539. Since Conner engaged in good faith bargaining, the NLRB is obligated to withdraw its § 8(a)(5) charge against the Respondents. The fact that no bargaining agreement came to fruition does not implicate Respondents. For these reasons, Petitioner is not likely to succeed in its attempt to prove there was a § 8(a)(5) violation.

### B. IRREPARABLE HARM WILL NOT OCCUR ABSENT THE IMPOSITION OF THE INJUNCTION

Petitioner is also responsible for showing that without an injunction, the employees will be irreparably harmed, and that this irreparable harm outweighs any harm that may come to the employer. *Lineback*, 979 F.Supp. at 847; *Kinney v. Pioneer Press*, 881 F.2d 485, 491 (7th Cir. 1989). The court must consider whether "the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial power ineffectual." *NLRB v. Electro-Voice*, 83 F.3d 1559, 1573 (7th Cir. 1996). The U.S. Supreme Court has held that the "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that there is a possibility of such harm may occur. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 27-28 (2008).

In spite of this stringent standard, Petitioner's examples of irreparable harm are laced with predictions and speculations that are unsupported by reality and do not reveal anything that will

likely happen, only what may possibly happen. Petitioner worries that morale may deteriorate and the passage of time will "predictably erode" union support, causing the employees to "predictably shun" the unions. Indeed, the Petitioner claims that the fact that Les Lis is unable to communicate with the former members of the unions is proof that such erosion has already occurred. However, "merely stating the conclusions without factual support does not make these conclusions true." *Indus. Hard Chrome* at *30. Moreover, Petitioner never considers that the employee is pleased with his current circumstances and does not want to be unionized. Instead, in its perspective, it is assuredly attributed to the irreparable harm.

The reality is that most of the drivers had left before Conner closed its operations, because they sensed Conner's irreversible financial ruin once Conner began to lose its major customers. Tr. 688. Theses drivers chose to leave Conner before it shut down and would not be eligible for reinstatement into the unions. Many other drivers were hired by Heidenreich, and still are eligible for a 401(k) plan, as well as dental and health insurance. Tr. 611. Moreover, Petitioner argues that the longer the time passes, the more irreparable harm is done to the effectiveness of the unions. However, the Board became aware of the situation on October 15, 2010 the day the charges were filed with the NLRB. They had the same information at their disposal in October that they do now, but instead waited six months to file this § 10(j) petition. Any damage that may have been done is, at this point, only minimally reversible. Petitioner did not file a § 10(j) petition six months ago, because there was no urgency then, and there is no urgency now.

The hardships balance out in favor of the Respondents. A bargaining order would essentially require Heidenreich to negotiate with a union despite the fact that it has never, in its over two decades of existence, been unionized. There are only sixteen former Conner drivers and two former Conner dispatchers who currently work at Heidenreich and the dispatchers were never

members of the unions. The remaining labor force of Heidenreich is owner-operators, or independent contractors,[5] who cannot be unionized, and clerical workers who were never unionized. A 10(j) injunction would disrupt the status quo, not preserve it. It would force union certification on a company that never has never been unionized and does not wish to be so.

### C.     AN ADEQUATE REMEDY EXISTS

The hearing before the NLRB took place during the week of March 8, 2011. Petitioner submitted forty-seven different exhibits and called nine different witnesses. Petitioner and Respondent have since submitted detailed briefs. This case is now in its later stages, and all that is needed is the ALJ's final decision. There is no need for expediency, and clearly, Petitioner agrees, since the Petitioner has already allowed six months to lapse without calling for an injunction. There was no testimony to suggest that union activity was chilled or that the former union members are afraid of unionizing.[6] The ALJ's decision will be made in the near future, since all the evidence has been presented and briefed. Without question, the ALJ's decision is the adequate remedy at law, and to hold otherwise would needlessly harm Respondents.

### D.     PUBLIC INTEREST DOES NOT NECESSITATE THE § 10(j) INJUNCTION

In deciding whether the public interest will be harmed, courts weigh the benefits and the costs to the public should the injunctive relief be granted or denied. *See Electro-Voice*, 83 F. 3d at 1574. "The public interest is furthered, in part, by ensuring that 'an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge.'" *Id*.

---

[5] *Nestle Holdings, Inc. v. Cent. States, Southeast and Southwest Areas Pension Fund*, 342 F.3d 801 (7th Cir. Ill. 2003). The court counted the owner-operators in looking at whether union work was transferred to non-union workers and held that owner-operators of trucks, like in this case, are independent contractors, not employees.

[6] This is unlike other cases where the Board presented testimony at the ALJ hearings that confirmed the fear employees had. *See Lineback*, 546 F.3d 491 at 501 (noting the employees feared the repercussions for testifying at the Board hearing).

In this case, however, Respondents never engaged in unfair labor practices, and therefore, public interest would be damaged, not furthered, should the § 10(j) injunction be granted. In essence, the bargaining order would force a non-union company to negotiate with a union. This would set a dangerous precedent that would allow a completely separate entity made up of a different work base to be forced to unionize simply because they once shared a common owner.

## V.    DISCOVERY AND AN EVIDENTIARY HEARING ARE WARRANTED

Prior to granting a § 10(j) injunction it is proper and necessary for the Court to grant Respondents' request for discovery and a full evidentiary hearing. At the core of Petitioner's argument is that they are likely to succeed in the underlying matter before the ALJ. At many points in the administrative record, there is conflicting testimony that may only be reconciled if discovery and an evidentiary hearing are granted. Only through these measures may the Court accurately assess whether Petitioner has met its burden of showing if it has a reasonable likelihood of success and accordingly, whether a § 10 (j) injunction is warranted.

### A.    THE REGIONAL DIRECTOR'S TESTIMONY IS RELEVANT AND NECESSARY

When this § 10(j) Petition was filed, Regional Director of Region 13 of the NLRB, Joseph A. Barker verified the Petition under oath. He stated:

> I, Joseph A. Barker, being duly sworn, depose and say that I am the Regional Director of Region 13 of the National Labor Relations Board; that I have read the foregoing Petition and exhibits and know the contents thereof; that the statements made as upon personal knowledge are true and those made as upon information and belief, I believe to be true.

In response to the § 10(j) Petition, Respondents issued discovery, including a Notice to Produce All Non-Privileged Documents, as well as Notice of Video Deposition Duces Tecum for Joseph A. Barker. By signing the verification page, Barker attested that he has relevant information that is subject to be discovered by Respondents. Barker claimed he has personal knowledge for the

need of the injunctive relief. It would be unfair and unreasonable to deny Respondents their only

opportunity to test the veracity of this statement. As stated, a § 10(j) injunction is an extraordinary

remedy and it is already clear that an adequate remedy exists at law with the ALJ's findings should

the ALJ rule against the Respondents.

### B.  A PRECEDENT EXISTS TO ALLOW DISCOVERY

The Seventh Circuit has already held that  it is appropriate to depose the Regional Director

before a § 10(j) injunction is granted. In *NLRB v. Modern Drop Forge Co.*, the Company

subpoenaed then Regional Director, Elizabeth Kinney, with an accompanying request for

production of documents, and subpoenaed an NLRB representative with knowledge to support the

contention that such an injunction would be "just and proper." 1997 U.S. App. LEXIS 5185 *2.

The Seventh Circuit upheld the Company's right to depose Kinney and the NLRB representative,

despite their protests to the contrary. *Id*. at *10.

In *Madden v. Milk Wagon Union Local 753, et al.*, then Regional Director, Madden, also

refused to appear before a deposition, and the court held that it did not want to "merely rubber

stamp" requests for injunctive relief. The court ordered that "evidence establishing the 'reasonable

cause' basis for the injunction will have to be represented at the hearing on the petition." 229

F.Supp. 490, 492 (N.D. Ill. 1964). The court further held that unless discovery was permitted, the

"respondent will face the possibilities of surprise and inadequate preparation which the Federal

Rules were designed to eliminate." *Id*. Similarly, the Respondents here should be permitted to

engage in discovery if this court has any inclination to grant the Regional Director's request.

### C.  THE CREDIBILITY OF PETITIONER'S REASON FOR SEEKING A § 10(J) PETITION MAY ONLY BE ASSESSED THROUGH DISCOVERY AND AN EVIDENTIARY HEARING

At the hearing before the Board, conflicting testimony was presented, and its credibility

may only be assessed through discovery or an evidentiary hearing. Under § 10(j) of the NLRA,

this court has discretion to grant or deny discovery and an evidentiary testimony. 29 U.S.C. § 160 (j). Furthermore, there is nothing in the rule that prevents discovery and evidentiary testimony from taking place. However, in this case, where the court is being asked to grant the drastic measure of preliminary injunctive relief, it is required to assess the credibility of Petitioner's arguments, especially because the ALJ has not made any credibility determinations thus far, and the parties have varying interpretations of the facts. It is for that very reason that discovery and an evidentiary hearing be granted.

Indeed, many of the very same cases Petitioner relied on to support its § 10(j) Petition routinely either relied on discovery or evidentiary testimony. *See Electro-Voice, Inc.*, 83 F.3d at 1565 ("the district court relied on the record before the ALJ supplemented with additional evidentiary materials"); *Lineback*, 546 F.3d at 499 ("The district court conducted a hearing on June 22, 2007, to hear evidence on the need for injunctive relief beyond that presented at the administrative hearing.").

Where a response to a motion for preliminary injunction presents genuine issues of material fact, an evidentiary hearing is required. *See Medeco Security Locks, Inc. v. Swiderek,* 680 F.2d 37, 38-39 (7th Cir. 1981), where the court overturned the district court's holding, because it did not hold an evidentiary hearing. In this case, there has been divergent testimony on key elements of the Petitioner's case specifically, whether the Respondents did in fact have an alter ego relationship, whether Ted Lowery was a supervisor and whether Conner drivers were assigned Heidenreich routes before Conner closed. There are also disputes as to whether Christopher engaged in good faith bargaining before Conner closed. The Court is required to assess the strength of the Petitioner's position if it is at all inclined to grant Petitioner's request. To do that, the Court must assess the credibility of the parties' witnesses. If the Court does not uphold the credibility of the

Petitioner's witnesses, then a preliminary injunction is not only unnecessary but also is unwarranted. It is imperative that Respondents be given an opportunity to examine the credibility of Petitioner's witnesses before any decision to grant an injunction is made.

**VI.    CONCLUSION**

Based upon the arguments set forth above, Respondents respectfully request the Court to deny Petitioner's § 10(j) Petition for Injunctive Relief. Alternatively, Respondents respectfully request that the Court grant its request for discovery and evidentiary testimony, and for the Court to accordingly defer its decision until such discovery and evidentiary testimony is completed.

Respectfully Submitted,
A.D. CONNER, INC. and
HEIDENREICH TRUCKING COMPANY

By: ____/s/ L. Steven Platt_____

L. Steven Platt
Svetlana Zavin
Pedersen & Houpt
161 N. Clark, Suite 3100
Chicago, IL 60601
312-261-2507
lsplatt@pedersenhoupt.com
szavin@pedersenhoupt.com