**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH A BARKER, REGIONAL DIRECTOR OF REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD, for and on behalf of THE NATIONAL LABOR RELATIONS BOARD, | ) ) ) ) ) ) | Case No.: 11-cv-2255 |
| Petitioner, | ) ) | Judge Robert M. Dow, Jr. |
| v. | ) ) | |
| A.D. CONNER INC. and HEIDENREICH TRUCKING COMPANY, as alter egos, | ) ) ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is a petition for injunctive relief [4] pursuant to 29 U.S.C. § 160(j) ("10(j)")[1] filed by the Director of Region 13 for the National Labor Relations Board ("Petitioner"), against Heidenreich Trucking Company, as an alter ego of A.D. Conner Inc. ("Respondent"). For the reasons and in the manner explained below, Petitioner's request for a preliminary injunction is granted.

**I.       Background**

This lawsuit concerns violations of the federal labor laws that allegedly took place at A.D. Conner Inc. ("Conner"), a fuel hauling company owned by William J. McEnery ("McEnery"). In October 2010, Conner shut down and a number of drivers and a major customer transferred to another (non-unionized) company owned by McEnery, Heidenreich Trucking Company ("Heidenreich").

---

[1] Legislative history and case precedent commonly refer to this section as section 10(j), the section number in the National Labor Relations Act (the "Act"). Likewise, 29 U.S.C. §§ 157-159 and their subparts are hereafter referred to as Sections 7 through 9.

On October 15,[2] the Truck Drivers, Oil Drivers, Filling Station and Platform Workers Union Local No. 142 ("Local 142"), an affiliate of the International Brotherhood of Teamsters, filed a charge with the National Labor Relations Board ("NLRB" or the "Board"). The same day, the Truck Drivers, Oil Drivers, Filling Station and Platform Workers Union Local No. 705 ("Local 705") filed an identical charge. Both Unions[3] filed identical amended charges with the Board on January 19, 2011, alleging that Respondent engaged in (and continued to engage in) unfair labor practices within the meaning of Sections 8(a)(1), (3) and (5) of the Act. On January 31, 2011, the Board consolidated the cases involving the Unions.

After a period of investigation, on March 8, 9, and 10, 2011, the parties conducted an administrative hearing before an administrative law judge ("ALJ") of the NLRB. At the hearing, the ALJ heard testimony from ten witnesses and received a number of documents into evidence. On June 24, 2011 (after the instant petition was fully briefed), the ALJ issued his decision, which Petitioner then filed with the Court [75] (hereinafter "ALJ Decision"). Among other things, the ALJ concluded the following: that (1) Heidenreich and Conner were alter egos of each other; (2) Respondents' conduct in threatening to close its facilities and soliciting employees to decertify their Unions violated Section 8(a)(1) of the Act; (3) Respondents violated Section 8(a)(5) of the Act by dealing directly with union-represented employees; and (4) Respondents violated Section 8(a)(5) of the Act by refusing to bargain with the Unions about the effects of their decision to shut down Conner. The ALJ ordered Respondent to cease and desist in its violations of the Act and ordered Respondent to take a number of affirmative actions, including re-hiring terminated

<hr />

[2] Unless otherwise indicated, all dates are in 2010.

[3] The Court will refer to Local 142 and Local 705 collectively as the "Unions."

employees, paying employees the wages they formerly received under the Union contracts (plus

back-pay), and formally recognizing and bargaining with the Unions.

The following facts are those that are relevant to the instant petition, which requests that

the Court enter temporary injunctive relief prior to the Board's ruling in the pending

administrative action.[4]

### A. Background of the McEnery Entities[5]

In 1993, McEnery created The William J. McEnery Revocable Trust (the "Trust"), of

which he is the sole trustee. Tr. 584. At some point thereafter, McEnery transferred ownership

of his various companies to the Trust. Currently, the Trust is the sole owner of Conner,

Heidenreich, Gas City Ltd. (a chain of gas stations/convenience stores), and a number of other

companies including WJM Leasing, LLC, McEnery Trucking and Leasing, LLC, and McEnery

Enterprises, LLC. Tr. 584-586. McEnery is the president and secretary of all of these entities.

*Id.* None of these entities have any other officers or directors. *Id.* 585-586. All of the entities

---

[4] As noted above, the ALJ has issued its ruling in the instant matter before the Board, and in his decision, the ALJ makes a number of findings of fact and conclusions of law. As the Court will explain in detail below, the Court's central task in deciding a petition for Section 10(j) relief is making a "predictive judgment about how the NLRB is likely to rule." *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 503 n.4 (7th Cir. 2008). Because the ALJ "is the NLRB's first-level decisionmaker" and because he has "presided over the merits hearing," the "'ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.'" *Id.* (quoting *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001)). Accordingly, the ALJ's view of the facts and evidence presented at the hearing informed the Court's analysis in ruling on the instant petition. For the reasons explained in its previous orders [57, 62], the Court denied Respondent's request for discovery and a full evidentiary hearing, and has decided the propriety of awarding 10(j) relief on the basis of the record presented to the ALJ. As the Court will explain below, the Court was not required to make any credibility findings in order to decide the petition for Section 10(j) relief..

[5] The Court will cite the transcript of the hearing at the NLRB as "Tr." The Court notes that many statements of fact in both parties' briefs were not supported with citations to the record adduced at the hearing before the ALJ. For other facts, citations to the hearing transcript were provided, but the cited portions of the transcript did not adequately support the particular assertion. The Court has disregarded these statements. As the Seventh Circuit has stressed, it is not the court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job * * * to make it easy for the court to rule in his client's favor * * *." *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006).

engage in business operations that interrelate with Gas City in some fashion.

McEnery incorporated Conner in 1982. Out of all of the companies listed above, only Conner's employees ever belonged to a union. Before it shut down, Conner operated out of two locations, Frankfort, Illinois and Porter, Indiana. The larger location was Conner's headquarters in Frankfort. The employees at the Frankfort location belonged to Local 705, and the employees at the Porter location belonged to Local 142. In 2010, Conner employed 20 drivers in Frankfort and 15 in Porter. Conner's business mainly consisted of hauling gas to stations locally. Tr. 668-69. One of Conner's principal customers was Gas City. Conner's other customers included Jewel, Marathon, Speedway, Shell, and BP Amoco. Tr. 691-92.

McEnery testified that prior to the events in question, he had essentially removed himself from day-to-day operations of any of his entities.[6] Instead, David Christopher ("Christopher"), who is McEnery's son-in-law, managed the day-to-day operations at Conner. Tr. 664-65. Christopher's title was vice president of operations at Conner. Tr. 590. Christopher served as the "contact person" for Conner's relations with the Unions and was authorized to sign agreements with the Unions. Tr. 590-91.

An individual named Robert Heidenreich founded Heidenreich in 1986. The McEnery Trust bought Heidenreich in 2005, but Mr. Heidenreich remained involved in managing the business. Management testified that Heidenreich operated nationwide and mainly was in the business of hauling ethanol to and from refineries. *Id.* However, as discussed below, Heidenreich also hauled gas to local gas stations (namely, Gas City locations) on a regular basis. Heidenreich's business consisted solely of owner-operators; that is, Heidenreich's drivers owned

---

[6] However, there is testimony in the record suggesting that McEnery did play a major role in Conner's operations. For example, a Conner dispatcher, Robert Lofrano, testified that occasionally, McEnery would call Lofrano and direct him to allocate certain work to Conner and certain work to Heidenreich. Tr. 310-11; ALJ Decision at 7. Additionally, the ALJ credited testimony establishing that "McEnery took a hands-on approach to the management of many of the enterprises' operations." ALJ Decision at 6.

their own trucks and were independent contractors of the company. Heidenreich's drivers never belonged to a union and were not "employees" of the company under the Act. Heidenreich operated out of the same Frankfort location as did Conner. Heidenreich also had a Porter location that was co-located with a Gas City outlet, but it appears that Heidenreich did not share its Porter location with Conner. See *infra* n.10.

Robert Heidenreich and Peter Casper managed Heidenreich and were in charge of the company's labor relations. However, both Casper and Mr. Heidenreich reported to McEnery, and McEnery admitted that he "made the ultimate decisions * * * for the company." Tr. 663; see also Tr. 668. Mr. Heidenreich left the company sometime in the fall of 2010. Tr. 667.

Conner and Heidenreich had some similarities: They had common ownership, both were in the business of hauling petroleum products, and they shared the Frankfort location. (In fact, Conner, Heidenreich, Gas City, McEnery Trucking and Leasing, and McEnery Enterprises all shared the Frankfort facility. Tr. 586). Further, Lofrano testified that drivers for both companies obtained the fuel used to run their trucks from the same fuel tank on the Frankfort property. However, at least while they both were in operation, Conner and Heidenreich maintained separate drivers, equipment, and had a mostly-distinct customer base. Management testified that while Conner mostly hauled gas to local filling stations, apart from making Gas City deliveries, Heidenreich mostly hauled ethanol to and from refineries and operated nationwide.

### B. Events Leading to Conner's Shutdown

By 2010, both Gas City and Conner were in financial distress. In February 2010, McEnery wrote a letter to Local 705 in an attempt to engage the Unions in negotiations about their contract. Tr. 807. Around the same time, Christopher met with a representative of Local 705 to discuss Conner's precarious situation and to attempt to obtain concessions. Tr. 807-809;

Tr. 489.  Christopher kept Local 142 apprised of these discussions through phone calls.  Tr. 807-08.[7]

In June, Gas City filed for bankruptcy and began procedures to restructure.  Gas City lost its line of credit with Bank of America and was forced to shift to a "cash-basis," meaning that it was only able to pay for Conner's deliveries with cash that it had on hand.  See Tr. 835.

On August 5, Christopher sent an e-mail to the Unions with a proposal that included wage reductions and other concessions.  See Pet. Ex. 30.  Neil Messino (the Union representative for Local 705) testified that on August 19, he and Christopher met to discuss the proposal.  At the August 19 meeting, Messino told Christopher that the Union required an independent audit of Conner's financials in order to determine the severity of Respondent's stated economic position and whether Christopher's wage and benefits reduction proposals were fair.  Tr. 551-52.  The audit was completed within two weeks of that meeting.  *Id.*

There is a heated dispute between the parties about what generally occurred between February and late September.  Respondent's position is basically that the Unions stonewalled Conner—while Conner's financial position became more and more precarious, the Unions ignored Conner's pleas for help.  Petitioner claims that Conner never gave the Unions an opportunity to assess their position and bargain with management.  Regardless, Conner and the Unions did not agree on any concessions or enter into any new contracts during this period.  It is unclear whether management and representatives from the Union even spoke to each other between early August and mid-October.

---

[7] There is some evidence in the record that because each of the Union's contracts were substantially identical and the issues facing the Porter and Frankfort drivers were the same, negotiations with one Union were treated by all parties as pertaining to both of the Unions.  See. Resp. Br. at 9; Tr. 807-808.  The collective bargaining agreements between Conner and Local 705 and 142 expired on October 31, 2010, and in addition to discussing concessions, the parties needed to negotiate the terms of a new CBA.

Former Conner drivers Gregory Knorr and David Pippin testified that on September 21, Christopher and McEnery held a meeting with a select group of drivers in the Frankfort facility. Knorr testified that McEnery starting the meeting by saying "guys, I've got some bad news, I fucked up, we're broke." Tr. 83. Pippin testified similarly. According to Pippin, McEnery started by meeting by saying "that he didn't have any good news for us and that he was fucking broke and he wasn't paying the union any more fucking money." Tr. 167. According to Pippin, McEnery said "if we wanted to keep working that we would have to decertify the Union and go to work for him for less money." Tr. 167. Similarly, Knorr testified that McEnery said that "[t]here will be no more fucking union, no more" and that "if the company wanted to continue on that we would have to decertify to continue as employees." Tr. 84. Pippin testified that if the workers refused to get rid of the Union, McEnery said that he would "shut the doors." Tr. 168.

At the September 21 meeting, Christopher and McEnery passed out a sheet of paper, showing the drivers how much money they would be paid once they got rid of the Union. Tr. 168; Pet. Ex. 3. It showed significant wage reductions and other concessions. After the drivers saw this piece of paper, many were "upset" and said that they "couldn't afford to work for these wages." Tr. 169. The drivers discussed going to their Union to discuss McEnery's demands. In response, McEnery told the drivers that they "were going to have to talk to everybody and decertify and let the Union know that we didn't want to be unionized anymore." Tr. 169. Knorr and Pippin gave entirely consistent accounts of the September 21 meeting. At the hearing before the ALJ, neither McEnery nor Christopher directly contradicted Pippen and Knorr's testimony. In fact, Christopher admitted that at the September 21 meeting, McEnery told the drivers that "the company was broke" and that "he needed concessions." Tr. 822-24. Christopher characterized the handout that was distributed at the meeting as "a proposal of what was being

discussed with the Union." Tr. 823-24.[8]

On September 23, Christopher wrote a memorandum addressed to "All AD Conner Drivers (Porter and Frankfort). See Pet. Ex. 5. In the memorandum, Christopher discusses the September 21 meeting and summarizes the wage and benefits proposals that were communicated to the drivers. Christopher wrote, in part:

> "We tried taking [sic] a group of select senior drivers to meet with. We felt that meeting with several drivers would be more productive vs. getting in front of our entire group of Frankfort and Porter drivers. During the meeting, it was reiterated to the drivers the importance of getting concessions passed through due to the financial condition of AD Conner. A proposal was also put onto the table regarding what we were looking at from a wage and benefit reduction. * * *"

*Id.* The memorandum also referenced Christopher's ongoing discussions with the Union. *Id.*

On September 28, Christopher held a meeting at the Porter facility. Heidenreich employee James McClelland and former Conner employee Darin Meadows testified that on September 28, Christopher held a meeting with approximately 12 Porter drivers. Tr. 223. According to these employees, Christopher said that "the company was losing money and that we needed to take a pay cut and [a] cut in our pension" or "the company would have to close." Tr. 223. Here again, Christopher distributed a document showing how pay and benefits would need to be reduced. *Id.*; Pet. Ex. 10. Christopher allegedly said that the Union's health insurance, pension, and union wages needed to be eliminated "to save the company." Tr. 268; 225. Christopher allegedly said that "disbanding the Union" so "there would be less expenses" would be one way to help the company survive. Tr. 225-26.

Pippin testified that by the beginning of October, management had decided that Conner would be shut down. Tr. 150-51. At this time, according to Pippin, Christopher began to call Conner's clients to tell them of the impending shut down and that they "probably need[ed] to

_____

[8] The ALJ also concluded that McEnery's and Christopher's testimony at the hearing "served to confirm and corroborate the descriptions provided by the drivers" of the September meetings. ALJ Decision at 13.

look for other carriers." Tr. 151. According to Pippin, Christopher later admitted to him that he made these calls and "got rid of the accounts faster than what he should have." Tr. 150. Petitioner asserts that these phone calls possibly "hasten[ed] the demise of A.D. Conner." Pet. Reply at 7. Whether because of Christopher's phone calls, or because Conner's rates were not competitive (see Tr. 812-15), at around the time of the shutdown, Conner lost most of its major customers, including BP Amoco, Shell, Marathon, and Jewel. Tr. 691-93.

Representatives from Local 705 had scheduled their first bargaining session with Conner management for October 18. Tr. 540. Local 705 scheduled a meeting with its employees for October 9 to "make them aware of what was going on." Tr. 552. Two days after that meeting took place, on October 11, Messino testified that he called Christopher with the news that the drivers had agreed to accept the wage and benefit reductions that the Company said were necessary. Tr. 905; see also Tr. 865.

On October 13, Christopher canceled the scheduled October 18 bargaining session and told the Union that Conner would be ceasing operations. Tr. 541-42; 867; Pet. Ex. 29. October 13 was the first that the Union learned of Conner's decision to close. Union representatives did not have an opportunity to sit down to bargain with Conner's representatives before Conner closed its doors. Between June and October 18 (the date of the shut down), neither of the Unions had begun to bargain about the terms of the next collective-bargaining agreement, or had sat down to discuss Christopher's August 5 wage and benefits reduction proposal in detail. Tr. 553. After the shut down of Conner, neither Union was permitted to bargain about, for example, who would be selected to transfer from Conner to Heidenreich, what those workers' wages would be, or whether there would be any carryover of seniority at Heidenreich.

McEnery testified that he made the decision to shut down Conner. Tr. 591. McEnery never personally attempted to bargain with the Unions about the shutdown; instead he relied on Christopher's attempts to do so. Tr. 591-592.

### C.  Transfer of Employees and Work to Heidenreich

At the time of the shut-down, Christopher and McEnery discussed how many of Conner's drivers should be hired over to Heidenreich in order to continue servicing their customers. Immediately following the shutdown of Conner, 16 Conner drivers and two dispatchers were hired to work for Heidenreich. See Tr. 676-77.

On October 13, Christopher wrote an e-mail to Lowrey that indicated that it was intended to be passed on to the Conner drivers. Pet. Ex. 13. Lowrey had been acting as a sort of "conduit" for communications between management and the Conner drivers. See ALJ Decision at 21-25. In the e-mail, Christopher tells Lowrey that "[w]e are still determining the number of drivers that we would need to service Gas City and any other customers through Heidenreich." Pet. Ex. 13. Christopher instructed Lowrey to tell the drivers to apply online for jobs at Heidenreich and informed Lowrey what the drivers' salaries and benefits would be. *Id.* The e-mail concludes with the phrase: "I could not put the above into a formal letter *due to union issues*, but this can be verbally conveyed to them." *Id.* (emphasis added). The ALJ described the e-mail as "smoking gun evidence." ALJ Decision at 16 n.22 ("It has been my experience that the record rarely affords "smoking gun" evidence, particularly regarding the intent and motivation of parties to lawsuits. This e-mail represents a striking exception * * *.").

On October 12 and 13, Christopher and Lowrey (speaking at Christopher's behest) began contacting former Conner drivers, and asked them to apply for a job at Heidenreich. In an e-mail

to the drivers, Christopher advised that applications were available "on the web." See Pet. Ex. 18.

Those drivers that were hired on at Heidenreich were not required to submit new tax or I-9 forms when they were initially hired and were not given any sort of orientation upon starting their new jobs. Tr. 196, 284, 485, 295.[9] After being rehired at Heidenreich, the 16 drivers continued to work out of the same Frankfort facility, and continued to use the same trucks, keys, and other equipment to make their deliveries. Tr. 67, 92, 178, 180, 274, 295-96.[10] Someone at Heidenreich had just ripped the "A.D. Conner" stickers off the former Conner trucks, and replaced them with Heidenreich stickers. Tr. 182, 275. The dispatch sheets were in the same form and format; only a Conner logo had been replaced with a Heidenreich logo. The drivers' job duties and work processes at Heidenreich were generally the same as they had been at Conner—they were still responsible for delivering petroleum products, and mostly to the same Gas City locations that they had previously serviced. See, *e.g.* Tr. 183; 238-39.

As noted above, around the time of the shutdown, Conner lost most of its major customers, including BP Amoco, Shell, Marathon, and Jewel. Tr. 691-93. These customers did not begin to use Heidenreich after Conner's shutdown. Respondent explains that generally, to qualify as a carrier for a particular gas station customer, there is a detailed vetting process that can take months to complete before final approval is given. For that reason, when Conner shut down suddenly, Heidenreich was not able to haul for most of Conner's customers, as it had not

---

[9] However, employees proposing to transfer from Conner to Heidenreich *were* required to fill out some sort of application form in order to be considered for a position at Heidenreich. See Pet. Ex. 13.

[10] Heidenreich's Porter branch always operated out of a different location than Conner's Porter branch. (The Conner branch in Porter operated out of a "Steel City" building while Heidenreich was run out of a trailer.) Tr. 248-51; 296-98. It is unclear whether the trailer was on the same property as the Conner location. After the shutdown of Conner, the Heidenreich Porter branch continued to operate out of the trailer.

gone through the vetting process with them.  Tr. 871.  However, Conner's biggest account, Gas City, went to Heidenreich, and the 16 formerly-Conner drivers serviced this account (as they did when they worked for Conner).  Tr. 183.[11]

When they were at Conner, the driver-employees had earned $25.15 per hour.  Tr. 102-04; 191.  Currently, at Heidenreich, they earn $22.75 per hour.  Further, drivers at Conner had had their medical and dental benefits provided through the Union.  Tr. 104-105.  At Heidenreich, they must pay $338 per month for medical and dental benefits.  Tr. 191.  Drivers at Conner had received a pension through each respective Local pension fund; while at Heidenreich employees have no retirement benefits.  Tr. 106.  As Heidenreich drivers, the 16 have less paid time off than they did at Conner.  See Pet. Br. at 20 n.17; ALJ Decision at 20.

Following the shutdown of Conner, Christopher became the vice president of operations for Heidenreich.  Tr. 602.  Christopher became responsible for overseeing the 16 driver employees at the company, while Casper retained management of Heidenreich's owner-operator drivers.  E-mails and other record evidence establish that during the critical period immediately prior to and following the shutdown, Christopher was at the reins for all supervisory and managerial decisions involving the transfer of work from Conner to Heidenreich.  See, *e.g.* Pet. Ex. 13.

---

[11] While Heidenreich had made regular deliveries to Gas City stores before the shut down of Conner (see ALJ Decision at 7-8 (citing testimony)), Petitioner introduced evidence that Heidenreich began delivering to new Gas City locations after Conner closed, and Heidenreich's volume of deliveries to Gas City greatly increased.  See Pet. Mem. at 12-13 (citing exhibits).  Respondent explains that after Conner's closure, Gas City needed a new petroleum hauler, and Gas City's "bankruptcy status discouraged all other carriers from agreeing to service them."  Resp. Br. At 9.  As a result, according to Respondent, Heidenreich "had to enter the commercial petroleum hauling business and haul fuel to Gas City to prevent that entity from also closing its doors."  *Id.* at 10 (citing Tr. 894-95).

## II.     Legal Standard

Section 10(j) of the National Labor Relations Act authorizes a district court to enter "just and proper" injunctive relief pending the final disposition of an unfair labor practices claim by the National Labor Relations Board ("Board").  *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001) (citing 29 U.S.C. § 160(j)); see also *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499–500 (7th Cir. 2008).

Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

Like many other forms of preliminary injunctive relief, an injunction issued under the authority of Section 10(j) has been described as an "extraordinary remedy."  *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996) (quoting *Szabo v. P\*I\*E\* Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir. 1989)).  Relief under Section 10(j) should be granted "only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process."  *Id.*

In *Bloedorn*, the Seventh Circuit set forth the applicable standard for obtaining relief under Section 10(j).

> "The familiar factors that courts reference in weighing the propriety of preliminary injunctive relief in other contexts—the lack of an adequate remedy at law, the balance of potential harms posed by the denial or grant of interim relief, the public interest, and the petitioner's likelihood of success on the merits of its complaint—apply to requests for relief pursuant to section 10(j) as well.  Thus, the Director will be entitled to interim relief when: "(1) the Director has no adequate remedy at law; (2) the labor effort would face irreparable harm without

> interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; (3) "public harm" would occur in the absence of interim relief; and (4) the Director has a reasonable likelihood of prevailing on the merits of his complaint. The strength of the Director's case on the merits affects the court's assessment of the relative harms posed by the grant or denial of injunctive relief: the greater the Director's prospects of prevailing are, the less compelling need be his showing of irreparable harm in the absence of an injunction."

*Bloedorn*, 276 F.3d at 286-87 (citing *Kinney v. Pioneer Press*, 881 F.2d 485, 490 & n.3, 493 (7th Cir. 1989) and *Electro-Voice*, 83 F.3d at 1566) (internal citations and quotations omitted)); see also *Lineback*, 546 F.3d at 500.

"The Director bears the burden of establishing the first, third, and fourth of the above factors by a preponderance of the evidence." *Lineback, LLC*, 546 F.3d at 500; see also *Electro–Voice, Inc.*, 83 F.3d at 1567. However, as noted above, the strength of the Director's case on the merits affects this Court's assessment of the relative harms posed by the grant or denial of injunctive relief. *Id.* (citing *Bloedorn*, 276 F.3d at 286). As such, the second prong is evaluated on a sliding scale: the better the Director's case on the merits, the less compelling need be his showing of irreparable harm in the absence of an injunction, and *vice versa*. *Id.* But even with the sliding scale between probability of success on the merits and degree of harm, Petitioner must surpass the "possibility" threshold into "likelihood" on each prong: it must be likely that he will succeed on the merits and it must be likely that he will suffer irreparable harm in the absence of an injunction; the sliding scale does not remove the burden of this likelihood threshold from Petitioner. See *Winter v. National Resources Defense Council, Inc.*, 129 S.Ct. 365, 375 (2008) ("We agree with the Navy that the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."); see also *Nken v. Holder*, 129 S.Ct. 1749, 1762 (2009) (discussing similar standards for issuance of stay and noting that the

"possibility" standard for success on the merits and irreparable harm is too lenient). "Likely" means more than "better than negligible" and "more than a mere possibility of relief." *Nken*, 129 S.Ct. at 1761.

While a court considers a request for an injunction under Section 10(j) "with an eye toward the traditional equitable principles," *Kinney*, 881 F.2d at 490, Section 10(j) proceedings differ from ordinary preliminary injunction situations in a fundamental sense. As the Court explained in its prior order ([62] at 1-2), a motion for a preliminary injunction requires the district court to undertake its own analysis of the moving party's likelihood of success on the merits of its claim. By contrast, in considering the moving party's "likelihood of success" in the Section 10(j) context, "it is not the district court's responsibility * * * to rule on the merits of the Director's complaint." *Bloedorn*, 276 F.3d at 287. In fact, "a federal court has no jurisdiction to pass on the merits of the underlying case before the Board." *Electro-Voice*, 83 F.3d at 1567. Instead, "deciding the merits of the case is the sole province of the Board." *Lineback*, 546 F.3d at 502. The Seventh Circuit has explained that the "court's mission" in a Section 10(j) case "is to determine whether the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual." *Electro-Voice*, 83 F.3d at 1567. In undertaking that task, "[t]he district judge must assess not only the harm that may go unchecked during the 'notoriously glacial' course of NLRB proceedings * * * , but also the probability that the General Counsel *will succeed in convincing the NLRB* that someone has in fact violated the labor laws." *Kinney*, 881 F.2d at 491 (emphasis added). In short, as the court of appeals has succinctly summarized, "[a]ssessing the Director's likelihood of success calls for a *predictive judgment about what the Board is likely to do* with the case." *Bloedorn*, 276 F.3d at

288 (emphasis added).  As noted above, "[t]he ALJ is the NLRB's first-level decisionmaker, and, '[h]aving presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.'" *Lineback*, 546 F.3d at 503 n.4 (quoting *Bloedorn*, 276 F.3d at 288).[12]

## III.  Analysis

### A.    Likelihood of Success on the Merits

In his brief in support of his petition for relief under Section 10(j) of the Act [58], Petitioner identifies six separate violations of the federal labor laws.  Below, the Court will make a "predictive judgment," *Bloedorn*, 276 F.3d at 288, about Petitioner's likelihood of success on

---

[12] Respondent argues that *Winter v. National Resources Defense Council, Inc.*, 129 S.Ct. 365 (2008), cited above, substantially changed (or in Respondent's word, "thawed") the standard that courts in this circuit use to decide Section 10(j) cases.  See Resp. Request for Leave to File Additional Authority [72] at ¶ 3. In *Winter*, the Supreme Court confirmed the traditional four-factor test as the test that a plaintiff must meet in order to obtain a preliminary injunction.  129 S.Ct. at 374 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").  The Court also clarified that, at a minimum, a party moving for a preliminary injunction must "demonstrate that irreparable harm is *likely* in the absence of an injunction," and that the mere "possibility" of irreparable harm will not suffice.  129 S.Ct. at 375-76 (emphasis in original).   In *Nken*, the Court cited *Winter* favorably, and confirmed that "simply showing some possibility" of irreparable injury or success on the merits fails to satisfy the test.  *Nken*, 129 S.Ct. at 1761 (citing *Winter*, 129 S.Ct. at 375).  In support of its argument that *Winter* altered the standard that courts in this circuit apply to 10(j) injunctions, Respondent attaches a recently-issued opinion from the Western District of Pennsylvania, *Chester v. Grane Healthcare Co., et al.*, Civil No. 3:2010-225; 3:2010-244 (W.D. Pa. June 2, 2011).  In *Chester*, the judge held that the Supreme Court's endorsement of the traditional four-prong test for obtaining preliminary injunctive relief in *Winter* abrogated the two-factor test that the Third Circuit previously used for evaluating petitions for Section 10(j) injunctions.  See *id.* at 7-8 (discussing two-factor test from *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247 (3d Cir. 1998) ("A district court's determination whether to issue temporary injunctive relief under § 10(j) involves a two-fold inquiry: (1) whether there is reasonable cause to believe that an unfair labor practice has occurred; and (2) whether an injunction would be just and proper.")).  However, the analysis from *Chester* is inapplicable to this case, as the Seventh Circuit has never adopted the Third Circuit's two-prong test and has instead required courts in this circuit to evaluate Section 10(j) petitions under the "traditional" four-prong test.  *E.g. Bloedorn*, 276 F.3d at 286-87; *Kinney*, 881 F.2d. at 490.  In any event, to the extent that there is a difference between the approaches taken by the Third and Seventh Circuits, Petitioner would be entitled to relief under either standard.

three of the six asserted violations.[13]  However, the Court first must address the threshold issue[14]

of whether Heidenreich can be considered an "alter ego" of Conner, such that Heidenreich can be

held to Conner's obligations under the labor laws.

### 1.    Alter Ego Analysis

An employer may not avoid its obligations under the Act by substituting one corporate

entity for another where in reality the different corporate entity is only a "disguised continuance"

or alter ego of the other.  *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942); see also

*Howard Johnson Co. v. Detroit Local Executive Board*, 417 U.S. 249, 259 n.5 (1974) ("a mere

technical change in the structure or identity of the employing entity, frequently to avoid the

effect of the labor laws, without any substantial change in its ownership or management," is

properly disregarded, and such an alter ego is "subject to all the legal and contractual obligations

of the predecessor.").  The doctrine "focuses on 'the existence of a disguised continuance of a

former business entity or an attempt to avoid the obligations of a collective bargaining

agreement, such as through a sham transfer of assets,'"  *Central States, Southeast and Southwest

Pension Fund v. Sloan*, 902 F.2d 593, 596 (7th Cir. 1990) (quoting *International Union of

Operating Engineers, Local 150 v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir.

---

[13] In its brief, Respondent takes issue with the fact that Petitioner did not argue all of the charges asserted in the Amended Consolidated Complaint in support of the instant petition.  Resp. Br. at 6.  However, Respondent cites no law for the proposition that the Director must argue the merits of his *entire* complaint when seeking Section 10(j) relief before a district court judge.  Petitioner explains that he "demonstrated prosecutorial restraint in eliminating additional theories which were unnecessary and improper as they were remedial in nature when this action is equitable."  Pet. Reply at 3 n.4.  Similarly, although Petitioner's opening brief identified six separate violations of the Act, the Court will address only three of them.  This is because, as the Court explains below, Petitioner has a relatively strong likelihood of success on the first three claims.  As the Seventh Circuit has recognized, "once the Director presents evidence sufficient to tip the scales in her favor, nothing more is required."  *Electro-Voice, Inc.*, 83 F.3d at 1567.

[14] At the 5/13/11 oral argument on this petition, counsel for Petitioner conceded that the alter ego theory was the "linchpin" of Petitioner's case, since that theory allowed Heidenreich to be held responsible for violations committed at and by Conner.  See Transcript of Proceedings on 5/13/2010, at 35.

1987)), or through a "simpl[e ] alter[ation of the] corporate form.'" *NLRB v. Dane County Dairy*, 795 F.2d 1313, 1321 (7th Cir. 1986).

Whether the successor company is the alter ego of its predecessor is a question of fact. *Chicago Dist. Council of Carpenters Pension Fund v. Cotter*, 914 F. Supp. 237, 244 (N.D. Ill. 1996). In determining whether a successor corporation is the alter ego of its predecessor, courts consider several factors including "whether they have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Chicago Dist. Council of Carpenters Pension Fund v. Cotter*, 914 F. Supp. 237, 244 (N.D. Ill. 1996). The Seventh Circuit has explained that the NLRB has found an alter ego relationship where:

> "* * * the new employer is a "disguised continuance of the old employer" * * *; or was in active concert or participation in a scheme or plan of evasion * * *; or siphoned off assets for the purpose of rendering insolvent and frustrating a monetary obligation such as back pay * * *; or so integrated or intermingled its assets and affairs that "no distinct corporate lines are maintained." The Board has also found an alter ego relationship based on substantially identical business purposes, equipment, type of customers, actual joint day-to-day operations, joint labor relations, a favorable lease agreement, and the transient nature of the relationships between the companies. In some instances the criteria have been equated with the "basic indicia for finding a single employer, *i.e.*, interrelation of operations, centralized control of labor relations, common management, and common ownership or financial control" although "more must be shown to establish that one organization is the alter ego of another." We have also found an alter ego relationship to exist "even though no evidence of actual common ownership was present."

*Sloan*, 902 F.2d at 596-97 (quoting *Dane County Dairy*, 795 F.2d at 1321 and *District 23, United Mine Workers of America (Kentucky Lake Dock Co.)*, 271 NLRB 461 (1984)). "'Unlawful motive or intent are critical inquiries in an alter ego analysis.'" *Trustees of Pension, et al. v. Favia Electric Co., Inc.*, 995 F.2d 785, 789 (7th Cir. 1993) (quoting *Int'l Union of Operating Engineers v. Centor Contractors*, 831 F.2d 1309, 1312 (7th Cir. 1987)). No one factor is determinative, nor do all of the indicia noted above need to be present to find an alter ego relationship. *US Reinforcing, Inc.*, 350 NLRB 404, 404 (2007).

After carefully considering the record of the proceedings before the ALJ and the parties' briefs, the Court concludes that Petitioner has demonstrated a "reasonable likelihood," *Bloedorn*, 276 F.3d at 286-87, that he will succeed in convincing the Board that Heidenreich is an alter ego of Conner. In fact, Petitioner has already persuaded the ALJ that Conner and Heidenreich have an alter ego relationship. ALJ Decision at 31-36. The ALJ determined that each and every factor in the alter ego analysis supported such a conclusion, *id.*, and the Court agrees with the ALJ's analysis.

First, Heidenreich and Conner have identical ownership—both entities are completely owned by the McEnery Trust. *Sloan*, 902 F.2d at 596-97. Respondent concedes that this factor weighs in favor of an alter ego finding. Resp. Br. [59] at 16.

Second, there is sufficient evidence in the record such that the Board could conclude that both of the entities have "substantially identical management * * * [and] supervision." *Cotter*, 914 F. Supp. at 244. Ultimately, McEnery is responsible for supervising and overseeing both Heidenreich and Conner. There is evidence in the record that McEnery was personally involved in the day-to-day operations of Conner and in the allocation of work between Conner and Heidenreich. Prior to the fall of 2010, Christopher was responsible for the day-to-day management of Conner and was not closely involved in managing Heidenreich. However, the record shows that around the fall of 2010, Mr. Heidenreich left his company and Christopher essentially took the reins at Heidenreich, at least with respect to decisions involving the transfer of employees from Conner to Heidenreich. Immediately following the shutdown of Conner, Christopher became the vice president of operations for Heidenreich. On the other side of the ledger, Casper oversees the majority of Heidenreich's drivers; Christopher only had managerial authority over the 16 driver-employees.

Third, the Board could conclude that Conner and Heidenreich have identical business purposes—they are both in the business of hauling petroleum products.  As noted above, there is some testimony in the record from management that before Conner's demise, Conner hauled gas to local gas stations and Heidenreich mostly hauled ethanol to refineries across the nation.  The ALJ did not credit this testimony.  ALJ Decision at 32.  Instead, the ALJ looked to the evidence in the record that established that in addition to hauling to refineries, a significant portion of Heidenreich's business was (and continues to be) deliveries to Gas City retail locations.  *Id.* Accordingly, the Board could find that this factor supports an inference of alter ego status as well.

The next two factors (operation and equipment) weigh in favor of an alter ego finding. Prior to the shutdown, Heidenreich and Conner shared a facility (the Frankfort facility).  The two companies shared a fuel depot.  And most importantly, the two companies shared a major customer—Gas City.  Following their transfer to Heidenreich, the former Conner drivers reported to the same facilities (in both Frankfort and Porter) that they reported to when they worked at Conner.  Following the shutdown, the trucks that were formerly used by Conner drivers to deliver petroleum were immediately transferred to Heidenreich and given new markings.  At Heidenreich, the former Conner drivers continued to use the same trucks, keys, and other equipment to make their deliveries.  Their routes, procedures, and other methods of operations were the same.  Once they shifted to Heidenreich, the former Conner drivers performed much of the same work and made many of the same deliveries as they did in their former positions.  See *Dane County Dairy*, 795 F.2d at 1321-22 (the fact that "[e]ssentially, the same customers were serviced with the same equipment, only without union drivers" supported alter ego finding).

But most importantly, there is copious evidence from which the Board could conclude that McEnery decided to shut down Conner in order to avoid the collective bargaining and other labor-related obligations that it had to Conner's employees. As discussed above, during McEnery and Christopher's meetings with employees on September 21 and 28, they demanded economic concessions, blamed the unions for Conner's problems, and encouraged employees to decertify their representatives. The drivers, however, did not immediately comply with their demands; Union representation remained in place. Shortly after these meetings, Conner shut its doors and seamlessly transferred its largest customer (along with 16 drivers) to Heidenreich.[15] These events, along with their timing, could support an inference that McEnery and Christopher closed Conner in order to avoid their obligations under the Act. The October 13 e-mail from Christopher to Lowrey strongly suggests that the shutdown of Conner was effected at least in part for this reason. In fact, Christopher's statement in the e-mail that he could not put his communication "into a formal letter due to union issues" evidences an awareness of this illegal purpose. Pet Ex. 13. It also is relevant that the statements attributed to McEnery and Christopher at the September meetings suggest an animus towards the Unions and a desire to be in business without them. *Dane County Dairy*, 795 F.2d at 1322 ("to establish the last element, improper motivation, the general counsel provided the Board with documentary and deposition evidence demonstrating that [the employer was] openly hostile to the Union and the Board"). In addition, former Conner employees testified to several statements made by McEnery that could be interpreted as evidence of an attitude of animus towards the Unions. See Tr. 313-12 (former Conner dispatcher Robert Lofrano testified that "Mr. McEnery said that the Union was killing him."); Tr. 324 (Knorr testified that McEnery said "the Union's been killing me, it's been costing

---

[15] The lack of any "hiatus in operations" between alleged alter ego companies is probative evidence of unlawful motivation. *MIS, Inc.*, 289 NLRB 491, at *2 (1988).

me a million dollars a year for the past 15 years, and I just can't put up with it anymore.").  The ALJ evaluated the record in its totality, including McEnery's and Christopher's demeanor on the witness stand, and emphatically concluded that unlawful intent and motivation was behind the decision to close Conner and transfer its remaining work to Heidenreich.  ALJ Decision at 34-35.

Doubtless, there are some facts in the record that could lead the Board to conclude that Conner and Heidenreich are not alter egos of each other.  For instance, the Board theoretically could conclude that McEnery and Christopher shut down Conner *not* out of a desire to avoid its labor obligations, but because Conner had been experiencing severe financial difficulty since the beginning of 2010 and could simply not afford to keep operating at its then-existing cost structure.  But, in order to obtain relief under Section 10(j), Petitioner need not demonstrate that he surely will convince the Board that Conner and Heidenreich are alter egos; he need only demonstrate (by a preponderance of the evidence) that he has a "reasonable likelihood" of success on this theory, *Bloedorn*, 276 F.3d at 286-87, or put another way, that his chance of success on this theory is "more than a mere possibility."  *Nken*, 129 S.Ct. at 1761.  For the reasons discussed above, Petitioner easily had met that threshold.

### 2.      Coercive Statements in the September Meetings

Section 7 of the Act provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."  29 U.S.C. § 157.  Section 8(a)(1) of the Act provides that "[i]t shall be an unfair labor practice for any employer * * * to interfere with, restrain, or coerce employees in the exercise of the right[ ]" to organize collectively under the Act.  29 U.S.C. § 158(a)(1).  In order to establish a violation of this provision, "'[n]o proof of

coercive intent or effect is necessary * * * the test being whether the employer engaged in conduct, which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act.'" *Brandeis Machinery & Supply Co. v. NLRB*, 412 F.3d 822, 830 (7th Cir. 2005) (quoting *NLRB v. Gen. Thermodynamics, Inc.,* 670 F.2d 719, 721 (7th Cir. 1981)). "Threats of discharge, discipline, plant closure or other reprisals against employees for engaging in union activity are unlawful and violative of section 8(a)(1) of the Act because these acts reasonably tend to coerce employees in the exercise of their rights, regardless of whether they do, in fact, coerce." *Fleming Companies, Inc. v. NLRB*, 349 F.3d 968, 973 (7th Cir. 2003) (citing *N. Wire Corp. v. NLRB*, 887 F.2d 1313, 1318 (7th Cir. 1989)). It is also settled that a coercive threat may be implied rather than stated expressly. *Id.* (citing *Nat'l By-Products, Inc. v. NLRB,* 931 F.2d 445, 451-52 (7th Cir. 1991) and *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617-18 (1969)).

Here, former Conner drivers Knorr and Pippen testified that on September 21, Christopher and McEnery held a meeting with a select group of drivers in the Frankfort facility during which Christopher and McEnery threatened that if the drivers did not decertify the Union, the company would close. Tr. 87, 167-68. Similarly, Heidenreich employee McClelland and former Conner employee Meadows testified that Christopher held a meeting at the Porter location a week later at which he spoke to the dire financial condition of the company and warned that "the company would have to close," unless the employers agreed to pay and benefits cuts. Tr. 268; 225. Christopher allegedly said that "disbanding the Union" so "there would be less expenses" would be one way to save the company from shutting down. Tr. 225-26. As explained above, the testimony from these four employees went uncontested at the hearing before the ALJ. These threats of closure and admonitions to decertify the Unions are precisely

the sort of statements that have been found to be unlawful and violative of Section 8(a)(1) of the Act because they tend to coerce employees in the exercise of their rights. See, *e.g. N. Wire Corp.*, 887 F.2d at 1318 ("the threats of plant closure and other reprisals for union activity reasonably tended to coerce employees in the exercise of their statutory organizational rights"); *Multi-Ad Services, Inc. v. NLRB*, 255 F.3d 363, 373 (7th Cir. 2001) ("a threat of plant closure is per se a violation of § 8(a)(1)); *NLRB v. Champion Laboratories, Inc.*, 99 F.3d 223, 228 (7th Cir. 1996) (same); *Central Transport, Inc. v. NLRB*, 997 F.2d 1180, 1190-91 (7th Cir. 1993) (supervisor's threats to close down plant were unfair labor practice despite supervisor's lack of authority to effect plant closure). The ALJ concluded that management's threatening statements at the September 21 meetings violated Section 8(a)(1) of the Act, in that they "constituted direct and obvious threats to shutdown Conner and terminate its workforce if the employees decided to maintain their membership in the Union." ALJ Decision at 27. Similarly, the ALJ found that Christopher's statements to the Porter drivers also violated this section of the Act. *Id.* at 27-28.

In response, Respondent cites Section 8(c) of the Act, which, in acknowledgment of the First Amendment, makes it clear that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, * * * shall not constitute or be evidence of an unfair labor practice." 29 U.S.C. § 158(c). "This is a limited privilege, however," as the "Act accords no protection for views, arguments, or opinions that contain a threat of reprisal or force or promise of benefit." *NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 819 (7th Cir. 1991). Respondent maintains that "Conner never threatened its employees, nor did it ever instruct its employees to decertify their unions." Resp. Br. at 13. Instead, Respondent argues that the meetings were intended to "inform[] the drivers of the bleak outlook" of the company and the pamphlet distributed by

Christopher was intended to "prevent surprises, since McEnery and Christopher did not know what was communicated to the employees by the unions since June, 2010." Resp. Br. [59] at 9. Respondent maintains that "even if McEnery expressed his frustration, * * * an employer is protected by § 8(c) for saying anything he wants, even spewing epithets directed at the union, as long as there are no threats accompanied with the criticism."

Despite the potential availability of a defense based on Section 8(c) of the Act, the Court concludes that Petitioners have a strong likelihood of proving their Section 8(a)(1) allegations to the Board. First, many of the statements attributed to McEnery and Christopher appear—on their face—to be potentially of a threatening character. See, *e.g.* Tr. at 84 ("[t]here will be no more fucking union, no more" and "if the company wanted to continue on that we would have to decertify to continue as employees."). And even if the executives never expressly told the employees that they would be fired if they did not decertify their Union, it is "settled that a coercive threat may be implied" from the totality of the circumstances surrounding the statement. *Fleming*, 349 F.3d at 973; *Empire State Weeklies*, 354 NLRB No. 91, at *3 (2009). On the basis of testimony from Knorr, Pippin, McClelland, and Meadows, the Board could conclude that McEnery's and Christopher's statements were of the type that would "reasonably tend to coerce employees." *Fleming Companies, Inc.*, 349 F.3d at 973. Further, whether or not McEnery and Christopher subjectively intended their statements to be threatening or merely expressive of their own opinions is irrelevant to the analysis, as "[n]o proof of coercive intent or effect is necessary" for a violation of this section of the Act. *Id.*; see also *Scripps Memorial Hospital Encinitas*, 347 NLRB 52, at *2 (2005) ("in considering whether communications from an employer to its employees violate the Act, the Board applies the objective standard of whether the remark tends

to interfere with the free exercise of employee rights.  The Board does not consider either the motivation behind the remark or its actual effect.").

### 3.    Direct Dealing with Employees

An employer who deals directly with its unionized employees regarding terms and conditions of employment violates Section 8(a)(5) of the Act.  *Northwest Graphics, Inc.,* 343 NLRB 84, 93 (2004).  Unlawful direct dealing occurs when an employer communicates directly with union-represented employees, without the benefit of Union representation, for the purpose of changing wages, hours, and terms and conditions of employment.  *El Paso Electric Co.,* 355 NLRB No. 95, at *2 (2010); see also *Alan Ritchey, Inc. et al.*, 354 NLRB No. 79, at *64 (2009). Further, direct dealing need not take the form of actual bargaining.  *Allied Signal, Inc.,* 307 NLRB 752, 753 (1992).  "In any case, involving an allegation of direct dealing, the inquiry must concern whether the employer's direct solicitation is likely to erode 'the union's position as exclusive representative.'"  *Alan Ritchey, Inc. et al.*, 354 NLRB No. 79, at *64 (quoting *Modern Merchandizing,* 284 NLRB 1377, 1379 (1987)).  "Implicit in the obligation to bargain in good faith 'is the principle that the employer is not to go behind the union's back and negotiate with individual workers, nor otherwise to undermine the union's status as exclusive bargaining representative.'"  *Naperville Ready Mix, Inc. v. NLRB*, 242 F.3d 744, 757 (7th Cir. 2001) (quoting *Szabo v. U .S. Marine Corp.*, 819 F.2d 714, 718 (7th Cir. 1987)).  "This prohibition forecloses individual negotiations with unit employees, in most cases even if collective bargaining negotiations have reached an impasse."  *Id.*

In this case, Petitioner has a high likelihood of success of establishing that McEnery and Christopher wrongfully bypassed both of the Unions when they attempted to directly bargain with Conner drivers in Frankfort and Porter.  There is no suggestion in the record that a Union

representative was present at either of these meetings. Respondent admits that he distributed a document at the September meetings that contained Conner's proposal for reductions in wages and other benefits. See Pet. Exs. 3, 4. In fact, in his September 23 memorandum, Christopher effectively admitted that he bargained directly with employees. The memorandum summarizes the wage and benefits concessions that he communicated to drivers at the September 21 meeting and stresses the "importance of getting concessions passed through due to the financial condition of AD Conner." Pet. Ex. 5. When viewed through the lens of the solicitations of decertification and threats of closure made at these same meetings, the Board could conclude that McEnery's and Christopher's direct dealing about proposed changes to employees' terms of conditions of employment were calculated to undermine the Union's position as their exclusive representative. See *Alan Ritchey, Inc. et al.*, 354 NLRB No. 79, at *64; *Modern Merchandizing,* 284 NLRB 1377, 1379. The ALJ concluded that "it is obvious that management engaged in unlawful direct dealing during both meetings." ALJ Decision at 44. This Court agrees that Petitioner has a high likelihood of establishing that Christopher communicated "directly with union-represented employees" without their Union representatives present, "for the purpose of changing wages, hours, and terms and conditions of employment." *El Paso Electric Co.,* 355 NLRB No. 95, at *2.

Again, in his response, Respondent characterizes the meetings as "informational" and explains the document distributed by Christopher as intended to "prevent surprises." Resp. Br. [59] at 9. According to Respondent, Christopher and McEnery were not attempting to "bargain" with the employees, in that they did not demand that the employees accept Conner's terms. But such a requirement is not present in the law. As explained above, "direct dealing need not take the form of actual bargaining." *Allied Signal, Inc.,* 307 NLRB at 753. Instead, the "question is

whether an employer's direct [* * * communications with employees] is likely to erode the Union's position as exclusive representative." *Id.* Here, for the reasons explained above, the Board could find McEnery's and Christopher's communications to be an attempt at an end-run around the Union's exclusive representation of the drivers.

### 4. Failure to Bargain About Effects of Conner's Closure

Irrespective of its ongoing course of negotiations with the Union about wage and benefits concessions, once McEnery and Christopher decided to close Conner, they had a duty under Section 8(a)(5) to bargain with the Union "concerning the 'effects' of [their] decision to close." *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1286 (7th Cir. 1989) (citing *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 681-82 (1981)); see also *Central Transport, Inc. v. NLRB*, 997 F.2d 1180, 1188 (7th Cir. 1993) ("An employer is obligated to negotiate with the certified representative of its employees over the effects of a closure of all or a part of its business."); *Sea-Jet Trucking Corp.*, 327 NLRB 540, 544 (1999) ("Under Section 8(a)(5) and 8(d) of the Act, an Employer who relocates is required to bargain in good faith with the collective-bargaining representative of its employees regarding the effects of the relocation on those employees, even where decisional bargaining is not required as a mandatory subject of bargaining."). And this bargaining had to be done "in a meaningful manner and at a meaningful time." *Emsing's Supermarket,* 872 F.2d at 1286-87. When an employer shuts down a business unit and reallocates workers, it is required to bargain over the effects of the shutdown, including bargaining over which workers would be reallocated, the reallocated workers' wages, work locations, schedules, carryover of seniority, and other terms. See, *e.g., Sea-Jet Trucking Corp.*, 327 NLRB at 545; *Holly Farms Corp.*, 311 NLRB 273, 279 & n.25 (1993); *Cooper Thermometer Co.*, 160 NLRB 1902, 1912 (1966).

Here, the Union first learned of the shutdown on October 13. On October 13, Local 142 sent Christopher an "official notice of [the Union's] desire to enter into negotiations relative to the decision and effects of the closure." Pet. Ex. 23. Conner officially closed five days later, on October 18. On October 27, the Union sent McEnery and Christopher a list of interrogatories for information that the Union needed "in order to bargain effectively, concerning the decision to close AD Conner and the effects of this decision." Pet. Ex. 33. At no time were the Unions permitted to bargain about the effects of Conner's closure; for example, who would be selected to transfer from Conner to Heidenreich, what the workers' wages would be, whether there would be any carryover of seniority to Heidenreich, and so forth. Management never responded to the Union's request for information.[16] Respondent does not address this specific violation in its briefs.[17] Accordingly, Petitioner has shown a likelihood of proving to the Board that Respondent failed to properly notify and bargain with the Unions over the effects of the decision to close Conner in violation of Section 8(a)(5) of the Act.

### B. Irreparable Harm, Inadequate Remedy at Law, and Balancing of the Equities

As the Court explained above, Section 10(j) relief is an extraordinary remedy, reserved for those situations in which the effective enforcement of the Act is threatened by the delays inherent in the NLRB dispute resolution process. *Lineback*, 546 F.3d at 502. The purpose of Section 10(j) is to prevent employers from taking advantage of the "extraordinarily slow" NLRB resolution process to quash union support in the interim. *Id.* at 500; see also *Kinney*, 881 F.2d at

---

[16] Petitioner cites this failure to provide information to Local 705 as an independent violation under the Act. See Pet. Br. at 20 (citing *NLRB v. Acme Industrial Co.*, 385 U.S. 432 (1967)).

[17] Respondent argues that it "persistently attempted to negotiate in good faith beginning in February, 2010," (Resp. Br. at 21) and the record does support the contention that Respondent made some attempts to secure concessions with the Unions prior to Conner's closure. However, there is no contention (nor evidence in the record to support such a contention) that Respondent attempted to negotiate over the *effects* of the shutdown.

488 (citing S. Rep. No. 80–105, 80th Cong., 1st Sess. 8 (1947)). "A court should evaluate the equities through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Lineback v. Printpack, Inc.,* 979 F. Supp. 831, 847 (S.D. Ind. 1997) (internal quotation and citation omitted).

In assessing the propriety of injunctive relief, consideration must be given to the collective bargaining rights of the employees and what belated relief may mean to the future exercise of those rights. *Bloedorn*, 276 F.3d at 297. The Court must consider whether, in the absence of the requested injunctive relief, the collective bargaining and organizing rights of the employees will be irreparably undermined. *Id.*; *Electro-Voice, Inc.*, 83 F.3d at 1567 ("[C]onsidering the aforementioned factors * * *, this Court's mission is to determine whether the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual.").

Considering the facts of this case, the remedial authority of the Board cannot entirely cure the harms that are likely to occur in the interim. Notably, McEnery's and Christopher's actions have dramatically changed the *status quo* between management and the 16 former Conner drivers. Heidenreich's management has refused to recognize the Union's representation of these 16 drivers and has refused to abide by the terms of the expired collective bargaining agreement. Further, as time passes, management's actions diminish the Unions' ability to organize and effectively represent the 16 drivers after the Board issues its order. Consequently, the Director is without adequate remedies at law and temporary injunctive relief is necessary.

First, it is undisputed that Heidenreich refuses to recognize the Unions' representation of the 16 former Conner drivers, thereby, stripping those employees of their collective bargaining rights. This disruption of the balance of economic power sufficiently demonstrates the type of irreparable harm that cannot be adequately remedied by a protracted Board decision. See *Lineback*, 979 F. Supp. at 849. Further, the former Conner drivers working for Heidenreich are doing so under a number of unilateral and regressive changes to the employees' terms and conditions of employment. Such a demonstrated loss of benefits, secured in a manner other than through good-faith collective bargaining, is another type of harm that cannot be fully remedied by a future Board decision in the Director's favor. See *Bloedorn*, 276 F.3d at 299-300 ("The longer that [an] employer is permitted to benefit from a state of affairs that its own wrongdoing has brought about, the less likely it is that a final order in the Board's favor will be able to redress the wrongs that have been done and to restore the status quo ante.").

Moreover, a remedial order by the Board cannot cure harms being made to the Union's ability to effectively organize and represent the driver-employees in the future. It may be many months before the Board reaches the merits of the Director's case. See, *e.g. Electro-Voice*, 83 F.3d at 1573; *Barker v. Regal Health and Rehab Center, Inc.*, 632 F. Supp. 2d 817, 833 (N.D. Ill. 2009) ("Given that the Board is seriously shorthanded, it could be quite a while before it renders a decision in this proceeding."). In the interim, however, the alleged unfair labor practices have the potential to be "enormously destructive" to the Union's organizational efforts. See *Electro-Voice,* 83 F.3d at 1573 ("As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases. * * * The union's position in the [facility] may deteriorate to the point that effective organization and representation is no longer possible. As time passes, the benefits of unionization are lost and

the spark to organize is extinguished.  The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable.").  Diminution in Union support in the interim increases the likelihood that the employees will be irreparably deprived of Union representation when the Board finally issues its order.  *Id.*; see also *Lineback,* 979 F. Supp. at 848; *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 703 (1944) ("the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions").  Indeed, there is evidence that the erosion process has already begun, as employees already have stopped returning Union Representative Les Lis's calls.  Tr. 516-18; see also *Regal Health and Rehab Center, Inc.*, 632 F. Supp. 2d at 833 (that "at least two employees who had signed union authorization cards would not return [Union representative's] phone calls" was evidence of diminution of Union support).  Consequently, the diminution of Union support is also a sufficient demonstration of irreparable harm to the collective bargaining process to justify interim relief.  The longer that management is able to avoid bargaining with the Unions, the less likely the Unions will to be able to organize and represent their employees effectively if and when the Board orders Respondent to commence bargaining.  See *Lineback*, 546 F.3d at 500.

Respondent argued that "there is no need for expediency" here because "[t]his case is in its later stages, and all that is needed is the ALJ's final decision."  Resp. Br. at 25.  While it is true that the ALJ has now rendered his decision, there is no indication of how long it will take before the Board completes its review.  As noted above, the Seventh Circuit has recognized that NLRB proceedings are "notoriously glacial."  *Kinney*, 881 F.2d at 491.  In any event, the Court does not see why the possibility that the Board *might* quickly render a decision is a reason why interim relief should not issue.  In such a case, the interim relief would be in place for a relatively

short time,[18] and the only thing wasted would be the parties' time in litigating this petition and the Court's time in deciding it. Further, Respondent faults Petitioner for "allow[ing] six months to lapse without calling for an injunction." *Id.* The Court has reviewed the timeline provided in Petitioner's reply brief ([61] at 13-14) and finds no evidence of unreasonable delay.

This Court concludes that temporary injunctive relief is necessary to protect the collective bargaining and organizational rights of the former Conner employees. For the same reasons, there is no adequate remedy at law. Further, as discussed above, because Petitioner made a relatively strong showing on his likelihood of success, he was not required to make an equally strong showing of irreparable harm. *Lineback, LLC*, 546 F.3d at 500. Keeping that in mind, Petitioner certainly has made the required showing of irreparable harm.

Considering the balance of harms, Respondent does not even argue that it would be harmed by an injunction, other than to argue that a bargaining order would "essentially require Heidenreich to negotiate with a union despite the fact that it has never, in its over two decades of existence, been unionized." Resp. Br. at 24. But the Director is clear—he does not seek to impose bargaining obligations on the majority of Heidenreich's owner-operator labor force. Instead, the injunction that Petitioner seeks would cover only the 16 former driver-employees who were hired from Conner.

### C.    Public Interest of the Injunction

The Court also must examine whether Section 10(j) relief is in the public interest, weighing the potential public benefits against the potential public costs. *Electro-Voice,* 83 F.3d at 1573-74. The Seventh Circuit has indicated that "the interest at stake in a section 10(j) proceeding is the public interest in the integrity of the collective bargaining process."

---

[18] The 10(j) decree will terminate by operation of law upon the issuance of the Board's decision and order. See *Barbour v. Central Cartage, Inc.*, 583 F.2d 335, 337 (7th Cir. 1978).

*Bloedorn,* 276 F.3d at 300 (internal quotation marks omitted). "The public interest is furthered, in part, by ensuring that an unfair labor practice will not succeed" because of the protracted nature of Board adjudication. *Electro-Voice,* 83 F.3d at 1574 (internal quotation marks omitted). Similarly, the public interest is harmed when the NLRB's remedial powers lose their effectiveness due to the passage of time. *Lineback*, 979 F. Supp at 487.

The public interest would be served by interim injunctive relief here due to the serious nature of the alleged unfair labor practices and the relatively strong evidence that supports the Director's allegations. Interim relief will "help to preserve the Board's remedial authority and in that way serve the collective bargaining process." *Bloedorn*, 276 F.3d at 300. Furthermore, there is no evidence that injunctive relief would lead to any public harm. Interim relief is therefore in the public interest.

### D. Requested Relief

In their Petition ([4] at 13-15), Petitioners request the following relief:

A.      That the Court issue an order directing Respondent, pending final Board adjudication of the instant charge, to cease and desist from:

(1) refusing to recognize Locals 142 and 705;

(2) threatening to close because of employees' membership and activities on behalf of the Unions;

(3) telling employees that they will not be represented by a Union or that they should decertify the Union;

(4)      bargaining directly with employees;

(5)      shutting down operations without bargaining with Locals 142 and 705 and in retaliation for union activity;

(6) transferring bargaining unit work to a non-union entity in order to avoid contract obligations;

(7) repudiating the collective-bargaining agreements;

(8) failing and refusing to respond to Local 705's request for information; and

(9) interfering with, restraining, or coercing employees in the exercise of their Section 7 rights, in any like or related manner.

B. That the Court direct Respondent to take the following affirmative action:

(1) recognize and bargain with Locals 142 and 705 as the exclusive collective-bargaining representatives of the Respondent's Local 142 Unit and Local 705 Unit employees, including bargaining about the decision and effects of discharging A.D. Conner employees and transferring them to Heidenreich;

(2) apply the terms of the expired collective-bargaining agreements to the respective unit employees at Heidenreich;

(3) provide Teamsters Local 705 with the information requested on October 28, 2010;

(4) post a copy of this Order at the Respondent's facilities in Frankfort, IL and Porter, IN where notices to employees are customarily posted, said posting to be maintained during the Board's administrative proceedings, free from all obstructions and defacements, and agents of the Board be granted reasonable access to Respondent's facilities to monitor compliance with the posting requirement; and

(5) within 20 days of the issuance of this order, file with the Court a sworn affidavit from responsible officials of Respondent setting forth with specificity, the manner in

which the Respondent has complied with the terms of the Court's decree, including how the documents have been posted.

Respondent did not take issue with the specific details of the relief requested and the Court notes that such relief closely mirrors that granted in similar cases. See, *e.g. Barker v. Regional Health and Rehab Center, Inc.*, 632 F. Supp. 2d 817, 836-37 (N.D. Ill. 2009).

## IV.    Conclusion

For the foregoing reasons, Petitioner's petition for injunctive relief [4] pursuant to 29 U.S.C. § 160(j) ("10(j)") is granted.

Upon the entire record, it is hereby ORDERED, ADJUDGED, AND DECREED that, pending the final disposition of the matters now pending before the Board, Respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys, and all persons acting on its behalf or in participation with it, be, and they hereby are, enjoined and restrained from:

(1) refusing to recognize Locals 142 and 705;

(2) threatening to close because of employees' membership and activities on behalf of the Unions;

(3) telling employees that they will not be represented by a Union or that they should decertify the Union;

(4)      bargaining directly with employees;

(5)      shutting down operations without bargaining with Locals 142 and 705 and in retaliation for union activity;

(6)      transferring bargaining unit work to a non-union entity in order to avoid contract obligations;

(7)     repudiating the collective-bargaining agreements;

(8)     failing and refusing to respond to Local 705's request for information; and

(9)     interfering with, restraining, or coercing employees in the exercise of their Section 7 rights, in any like or related manner.

It is further ORDERED, ADJUDGED, AND DECREED that, pending the final disposition of the matters herein now pending before the Board, Respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, shall within five (5) days hereof, take the following steps:

(1)     recognize and bargain with Locals 142 and 705 as the exclusive collective-bargaining representatives of the Respondent's Local 142 Unit and Local 705 Unit employees, including bargaining about the decision and effects of discharging A.D. Conner employees and transferring them to Heidenreich;

(2)     apply the terms of the expired collective-bargaining agreements to the respective unit employees at Heidenreich;

(3)     provide Teamsters Local 705 with the information requested on October 28, 2010;

(4)     post a copy of this Order at the Respondent's facilities in Frankfort, IL and Porter, IN where notices to employees are customarily posted, said posting to be maintained during the Board's administrative proceedings, free from all obstructions and defacements, and agents of the Board be granted reasonable access to Respondent's facilities to monitor compliance with the posting requirement; and

(5)     within 20 days of the issuance of this order, file with the Court a sworn affidavit from responsible officials of Respondent setting forth with specificity, the manner in which the

Respondent has complied with the terms of the Court's decree, including how the documents have been posted.

Dated: July 11, 2011

_____
Robert M. Dow, Jr.
United States District Judge